**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Seihichiro TSUTAGAWA, Defendant-Appellee.**

**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Chihiro TAKAMATSU, Defendant-Appellee.**

**Nos. 73–2863, 73–2888.**

United States Court of Appeals, Ninth Circuit.

April 26, 1974.

Rehearing Denied Aug. 28, 1974.

---

David P. Curnow, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellant.

William N. Sauer, Jr. (argued), Carlsbad, Cal., Howard B. Frank (argued), San Diego, Cal., for defendants-appellees.

Before MERRILL, GOODWIN and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

The grand jury returned a separate indictment against each appellee charging the harboring and concealing of illegal aliens in violation of 8 U.S.C. § 1324(a)(3). Motions to dismiss the indictments were granted by the district court because all but four of the apprehended aliens were released and sent back to Mexico by the government. The government contends that the district court erred in applying United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971), because in the present case the aliens were apprehended incident to a

grand jury investigation directed towards unknown ranch owners and foremen supervising the employed illegal aliens rather than incident to an arrest. We reject the contention and affirm.

The United States Attorney's office, in connection with a proposed grand jury investigation, devised a plan whereby the Border Patrol agents, when they made their usual checks at ranches and farms, would be armed with grand jury subpoenae to be served on supervisory personnel in the area where illegal aliens were discovered or apprehended. The Border Patrol agents were also given a list of questions to ask apprehended illegal aliens in an effort to determine, among other things, whether farm supervisors or owners concealed or harbored them. The answers were to be given to the United States Attorney before the grand jury started taking testimony. The Border Patrol was instructed to send those illegal aliens with no information back to Mexico.

Three farms in San Diego County were selected as targets for the grand jury investigation. Both of the appellees were foremen at one of these farms. On June 12, 1973, Border Patrol agents raided the three farms' and apprehended 39 aliens; after an initial interview, 20 of these were released to Mexico. The following day, the remaining 19, together with reports of their field interrogations, were referred to the United States Attorney's office for further questioning. After all 19 aliens had been interviewed by the United States Attorney's office, six more were released to Mexico. The remaining 13 testified before the grand jury. Subsequent to testifying all of the aliens were released, except for four aliens who had been apprehended at the farm where the appellees were employed as foremen. These four were either paroled into the United States or kept in custody.

Tsutagawa was served with a subpoena the day the aliens were apprehended. That very day, the United States Attorney was advised by a local attorney that he represented Tsutagawa as well as the owner of the farm. Two days later, Tsutagawa testified before the grand jury and named Takamatsu as a foreman and as a result, he was also served with a subpoena and subsequently testified before the grand jury.

At no time were appellees or their attorneys given the opportunity to interview the 35 aliens prior to their return to Mexico. Appellees made an unsuccessful effort to find these expelled aliens in Mexico.

The government attempts to distinguish *Mendez-Rodriguez* on three grounds. First, it contends that in the present case, as distinguished from *Mendez-Rodriguez*, there was not a known defendant at the time the aliens were apprehended. Rather, the person to be indicted would not be determined until the completion of the grand jury investigation. The government notes that only two of the nine foremen and owners testifying before the grand jury were actually indicted. It further points out that a week had elapsed after the apprehensions before the evidence was complete as to Tsutagawa, and two weeks as to Takamatsu, at which time both indictments were returned.

■ Since government investigators are not equipped with crystal balls to determine unexpected or unforeseen results, there may be some circumstances in which *Mendez-Rodriguez* will not apply. However, this is not such a case. Before the apprehensions, the government had a reasonably small, known and identifiable number of targets, although names of potential defendants may not have been known. It had drawn a bead upon the owners and foremen of three farms, in the hope that it could flush out sufficient evidence to charge some of them with harboring and concealing illegal aliens.

■ Second, the government contends that *Mendez-Rodriguez* is distinguishable because in the present case there were no definite witnesses other than the four who were ultimately retained. But the statement itself demonstrates

the contention's fallacy. *Mendez-Rodriguez* prevents the government from determining who will be a helpful witness for the accused. The accused (or here, prospective accused) has the right to make that decision for himself, either by interviewing the potential alien witnesses or by waiving the right to do so. If the government believed, as it asserts in its brief, that rule 6 of the Federal Rules of Criminal Procedure prevented it from making a sufficient disclosure to prospective defendants to facilitate a meaningful interview of aliens, then its alternatives were to speed up the investigation or retain the 39 aliens for the two-week period.

The government is incorrect in suggesting that that retention would necessarily require incarceration. We have not invalidated the parole or farm-out methods of retention. United States v. Verduzco-Macias, 463 F.2d 105 (9th Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972). Nor are we impressed that Title 8, C.F.R. § 287.3 requires immediate expulsion of the aliens; it only requires processing within twenty-four hours.

Third, the government contends that *Mendez-Rodriguez* is distinguishable because in the present case there were no definite charges or specific facts extant. The contention is unmeritorious. The facts were present—the acts allegedly violating the immigration laws were history. The charges were not yet made, but the government was just as aware of the law it believed had been broken as it was in *Mendez-Rodriguez.*

The thrust of *Mendez-Rodriguez* is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant. *Compare* United States v. Romero, 469 F.2d 1078 (9th Cir. 1972), *cert. denied* 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973). The vice lies in the unfettered ability of the government to make the decision unilaterally. The Sixth Amendment guarantees a defendant the right to subpoena favorable witnesses. Washington v. Texas, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Here, the government placed witnesses, who may have been favorable to the appellees, outside the power of our courts to require attendance. In *Mendez-Rodriguez* we held that this same act denied the accused due process because it interfered with his ability to defend himself from criminal charges. 450 F.2d at 4–5. A defendant has the right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense.

Having based our decision in *Mendez-Rodriguez* on the Fifth and Sixth Amendments, we must be careful not to make an artificial distinction which in actuality fails to mandate a different constitutional result. In the present case we fail to see a distinction which would justify a conclusion different from the one we reached in *Mendez-Rodriguez.* We are well aware of the difficulties and soaring costs involved in retaining aliens until they have been interviewed and a decision made as to whether their testimony will be needed at trial. We are not here foreclosing alternative methods of meeting that challenge but the procedure followed in this case fails to satisfy the constitutional requirements.

Affirmed.