[Crim. No. 8081. Fourth Dist., Div. One. Apr. 22, 1976.]

THE PEOPLE, Plaintiff and Appellant, v.
ALFRED DAVID MEJIA, Defendant and Respondent.

[Civ. No. 14473. Fourth Dist., Div. One. Apr. 22, 1976.]

ALFRED DAVID MEJIA, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Edwin L. Miller, Jr., District Attorney, Terry J. Knoepp and Ralph J. Fear, Deputy District Attorneys, for Plaintiff and Appellant, for Respondent and for Real Party in Interest.

Philip M. Cohen, under appointment by the Court of Appeal, for Petitioner and for Defendant and Respondent.

## OPINION

**AULT, J.**—The People appeal from a dismissal pursuant to Penal Code section 1385 granted when they could not comply with the court's order to produce two material witnesses for trial. The witnesses had been deported to Mexico by the United States Immigration Service following their release from state custody.

Also pending before this court is the petition of defendant Mejia for a writ of mandate to review the court's earlier order denying his motion to compel disclosure of an informant (4 Civ. No. 14473). Consideration of the petition was deferred pending resolution of the appeal, but at the suggestion of this court both parties have discussed the merits of the writ proceeding in their briefs on appeal. We have ordered the two proceedings consolidated.

On their appeal the People contend the court erred in granting defendant's motion to dismiss because the unavailable witnesses were not material witnesses, their unavailability was not the result of any prosecutorial act or omission, and their absence did not deprive Mejia of a fair trial.

The motion to produce material witnesses or dismiss was submitted to the court on the transcript of the preliminary hearing, various stipulations and offers of proof, and the testimony of two investigators called at the hearing. From this evidence, the following facts appear.

A day or two before August 12, 1974, Deputy Sheriff Simmons, while assigned to the narcotics task force, was told by a reliable, confidential informant that "a David Mejia, living at 835 Iona Drive in San Diego, had in his possession over 100 kilos of marijuana which were in the bedroom of this residence." The informant also said the contraband belonged to Alfred David Mejia, that he had seen Mejia in the house on either August 11 or August 12, and that Mejia's wife had told him she and Mejia were in possession of marijuana and were selling it. Simmons checked official records and learned Mejia had previously been convict-

ed of a narcotics offense and that he had waived his Fourth Amendment rights as a condition of probation.

On August 12 Simmons and other officers went to the Iona Drive address. Shortly after Mejia had been observed standing in the front yard, Simmons knocked at the door and Mejia answered. Simmons identified himself and informed Mejia he had information there was a large amount of marijuana in the house, that Mejia had waived his Fourth Amendment rights, and that a search was to be conducted. When Simmons asked if he could come inside, Mejia replied, "Yeah, I guess so." Simmons then entered and found seven adults and two children in the living room. Agent Fisher searched the house, found 130 kilos of marijuana in a bedroom closet, and then placed everyone in the living room under arrest for possession of marijuana. The seven arrestees were: defendant Alfred David Mejia and his wife Jean, three residents of San Diego (George Leon, Grace Contreras and Henry Villegas) and two illegal aliens (Elias Velasquez-Velasquez and Alberto Payan Arce). At this time, the arresting officer quoted Mejia as volunteering: "It's mine, all mine. No one else knows anything about it."

After the arrests were made, about $2,000 in United States currency was found in Mejia's hand and about $2,000 more was found on the couch.[1] Further search of the house uncovered a letter addressed to Mejia's wife at the Iona Drive address and a medical card belonging to his young son David but nothing bearing the name of defendant Alfred David Mejia. Mejia and wife were arraigned on August 14 and their preliminary hearing was set for August 28. Both were held to answer in the superior court.

On October 2, Mejia and his wife were jointly charged in an information with possessing marijuana for sale in violation of Health and Safety Code section 11359.

The five other adults arrested with the Mejias were not prosecuted. The three local residents had been released without charges being filed, and the two Mexican nationals, Velasquez and Arce, had been turned over to the United States Immigration Service for deportation almost immediately after their arrests.

---

[1]Mejia did not have the money when he was originally searched. Apparently he obtained it after he was handcuffed and was attempting to place it in his son's clothing when it was discovered.

In November 1974 Mejia and his wife moved to compel disclosure of the informant. The motion was granted as to Mrs. Mejia but denied as to Mejia because the court concluded the informant could only incriminate him. The People then dismissed the charge against Mrs. Jean Mejia rather than disclose the informant's identity.

In January 1975 Mejia moved to compel the People to produce Velasquez and Arce as material witnesses or, in the alternative, to dismiss the case. From the testimony of investigators for the defense and for the immigration service, it appeared that Velasquez and Arce had been deported to Mexico within a few days after Mejia's arrest and long before his preliminary hearing. The People offered to provide defendant with the witnesses' addresses in Sonora, Mexico, and argues this fulfilled their duty to the defendant. From the testimony and accompanying stipulations, it became clear the People had dropped the charges against the two Mexican nationals, thus making them available for deportation. The People had released them to the federal authorities for their deportation on August 15 and August 19 without attempting to subpoena them, without notifying the defendant, and without making any arrangement with the federal authorities for their detention pending trial or for their later readmittance for trial. The prosecution had also learned that Velasquez had been convicted in Tijuana for trafficking in marijuana. It was also established that the defendant's investigator was not given an opportunity to see the police report until August 22, several days after the witnesses had been deported. Also before the court was the transcript of the preliminary hearing at which there was testimony that Mejia was separated from his wife, lived on B Street with his mother, and went to the Iona Drive address only to visit his son.

## DISCUSSION

■ A defendant in a criminal action is not entitled to a dismissal merely because he is unable to produce witnesses assertedly necessary to his defense (*People* v. *Kirkpatrick,* 7 Cal.3d 480, 486 [102 Cal.Rptr. 744, 498 P.2d 992]). If, however, state action has made a material witness unavailable, dismissal is mandated by due process and a defendant's constitutional right to a fair trial. The principles involved were recently summarized by the Supreme Court in *Bellizzi* v. *Superior Court,* 12 Cal.3d 33, beginning at page 36 [115 Cal.Rptr. 52, 524 P.2d 148]: "The fundamental due process principle . . . is that the prosecution may not deprive an accused of the *opportunity* to present material evidence which might prove his innocence. Even if the prosecution's motives are

'praiseworthy,' they cannot prevail when they *'inevitably* result, intentionally or unintentionally, in depriving the defendant of a fair trial.' [citing *People* v. *Kiihoa,* 53 Cal.2d 748 (3 Cal.Rptr. 1, 349 P.2d 673)]."

Generally speaking the People may select and choose which witnesses they wish to use to prove their case against a defendant. They are not, however, under principles of basic fairness, privileged to control the proceedings by choosing which material witnesses shall, and which shall not, be available to the accused in presenting his defense. (*United States* v. *Mendez-Rodriguez,* 450 F.2d 1, 4-5; *United States* v. *Tsutagawa,* 500 F.2d 420, 423.)

While the People concede Velasquez and Arce were deported to Mexico and are unavailable as witnesses, they contend dismissal of the case was not warranted because there was no showing the two aliens were material witnesses or that their absence was the result of state action.

There is no merit in the People's claim that Velasquez and Arce were not shown to be material witnesses. ■ When a defendant asserts that state action has made a material witness unavailable, the requirement of materiality is the same as when he seeks the disclosure of an unidentified informer. It is the *material character of the witness,* not of the testimony, which must be demonstrated. Any specific showing of the testimony is made impossible by the unavailability of the witness (*United States* v. *Mendez-Rodriguez, supra,* 450 F.2d 1, 5). When the evidence discloses the person unavailable either participated in the crime charged, or was a nonparticipating eyewitness to the offense, in a position to perceive what took place from a sufficiently proximate vantage point, such person is a material witness, and the defendant has demonstrated a reasonable possibility he could, if available, give evidence which would exonerate him (*Williams* v. *Superior Court,* 38 Cal.App.3d 412, 423-424 [112 Cal.Rptr. 485]).

■ The evidence at the hearing in the superior court showed that Velasquez and Arce were in the Iona Drive house before the police arrived, were present when the police entered, were present when the marijuana was found, and were present when Mejia was arrested. They either participated in, or were nonparticipating eyewitnesses to, the crime charged. Presumably they saw what occurred and heard what was said. They were arrested for possessing the same marijuana which is the basis of the charge against Mejia. Substantial and undisputed evidence

supports the court's implied finding that Velasquez and Arce were material witnesses. No showing that their potential testimony would exonerate Mejia was required (*Williams* v. *Superior Court, supra,* 38 Cal.App.3d 412, 423).

■ While conceding that Velasquez and Arce are unavailable as witnesses, the People disclaim any responsibility for their absence. They assert the deportation came about as the result of action by the federal government and not by state action. They distinguish federal cases which have required dismissal of criminal charges when material witnesses have been made unavailable by deportation (see *United States* v. *Mendez-Rodriguez, supra,* 450 F.2d 1; *United States* v. *Tsutagawa, supra,* 500 F.2d 420), by asserting that here the prosecutorial function was in the State of California, which had no power either to hold the witnesses for later use or to deport them.

If the federal government, unilaterally and without the knowledge and aid of state authorities, deports aliens who later turn out to be material witnesses in state court criminal proceedings, the distinction urged by the People might well be valid. That is not the case presented here. There can be no question but that state action initiated and was at least partially responsible for the fact Velasquez and Arce became unavailable as witnesses. They were apprehended and arrested by state authorities for violation of state law. State authorities learned they were aliens illegally in the United States. For reasons which do not appear, state authorities determined not to press charges against them. State authorities turned them over to federal immigration officials, knowing they would be deported and knowing that at least one of them had a record for trafficking in drugs. State authorities failed to notify the defendant of the action taken so that he had no opportunity either to interview the witnesses or subpoena them in the criminal proceedings pending against him.

In answer to this, the People say the prosecution did only what the law demands—"Surrender aliens to proper authority." While cooperation between state and federal law enforcement officials is to be commended and encouraged (*Elkins* v. *United States,* 364 U.S. 206, 221 [4 L.Ed.2d 1669, 1680, 80 S.Ct. 1437, 1446]), cooperation involves participation, and participation generally results in responsibility. It puts the participants in poor position to argue, "Don't blame me, the other fellow did it."

To the person whose constitutional right has been invaded, it makes little difference that the final action in bringing it about was taken by federal officers as opposed to state authorities (see *Elkins* v. *United States, supra,* 364 U.S. 206, 215 [4 L.Ed.2d 1669, 1676, 80 S.Ct. 1437, 1442-1443]).

In addition to their active conduct in turning over the material witnesses, to the. federal authorities for immediate deportation, state officials omitted to take the reasonable steps required to insure Mejia a fair trial. ■ It is settled that intentional suppression of material evidence upon request denies the defendant a fair trial regardless of the good or bad faith of the prosecutor, and that in some circumstances the prosecutor must, even without request, disclose material evidence favorable to the accused (*In re Ferguson,* 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234]). Even more appropriate is what was said by the Supreme Court in *People* v. *Goliday,* 8 Cal.3d 771, at page 781 [106 Cal.Rptr. 113, 505 P.2d 537]: "[T]he defendant is denied a fair trial whenever the police fail to undertake reasonable efforts to obtain information useful for locating a material witness informer who served as an active agent of the police."

While Velasquez and Arce were not informers or agents of the police, they were material witnesses in police custody. ■ The evidence indicates they would not have been deported had they been under subpoena. Knowing that material witnesses about to be released would be deported, state authorities made no effort to notify Mejia or his representatives so they could take such action as they deemed necessary to make the witnesses available at trial. Contrary to the People's contention, their responsibility was not met by simply furnishing Mejia with the witnesses' last-known addresses in Sonora, Mexico, long after they had been deported. That information evidently was of no help to the People when they were ordered to make the witnesses available or face dismissal of the action.

We have little doubt that the decisions in *Mendez-Rodriguez* and *Tsutagawa, supra,* have commendably resulted in United States authorities giving adequate notice to the defense before the deportation of material witnesses in federal criminal proceedings. No less should be required of state authorities when they have taken material witnesses into custody and then elect to drop the charges and to release them for deportation.

The evidence supports the trial court's implied finding that Velasquez and Arce became unavailable as witnesses through state action. Its order dismissing the action must be affirmed.

This holding makes it unnecessary to discuss the issues raised by Mejia's petition for a writ of mandate seeking review of the trial court's order denying his motion for disclosure of the informer. These issues have become moot and the petition should be dismissed.

The judgment of dismissal is affirmed; the petition for a writ of mandate is dismissed.

Brown (Gerald), P. J., concurred.

**WHELAN, J.**\*—I dissent, respectfully.

This case is not a proper vehicle for the conveyance of a sweepingly broad new declaration of prosecutorial obligation.

The case is one in which, assuming Mejia would have been denied a fair trial without the opportunity to present the testimony of Velasquez and Arce, the two aliens, there is presented a clear conflict between the rights of Mejia on the one hand, and those of Arce and Velasquez on the other.

When the three other persons arrested with them were released, Arce and Velasquez were not to be held by the *State* authorities beyond the time of the release of the others, merely because they were illegal aliens. Mejia could hardly complain if, with the three others, the Sheriff of San Diego County had released Velasquez and Arce to go out on the street. If held beyond the time of the release of the others, it was only because of the request of the federal authorities. A failure by the state authorities to release them without the federal hold would have presented a parallel situation to that in *United States* v. *Mendez-Rodriguez,* 450 F.2d 1, except that in *Mendez-Rodriguez* the retaining authority had the right to make the detention.

In *Mendez-Rodriguez,* of six persons taken into custody at the same time and under the same circumstances, three were held; the others were deported by the same federal authority which retained the others.

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

The situation was the same in *United States* v. *Tsutagawa,* 500 F.2d 420.

Mejia argued that the federal statute 18 United States Code Annotated section 3149 would permit the retention in custody by federal authorities of a witness in a state criminal prosecution. Clearly the section authorizes no such thing. The section reads: "If it appears by affidavit that the testimony of a person is material in any criminal proceeding, and if it is shown that it may become impracticable to secure his presence by subpena, a judicial officer shall impose conditions of release pursuant to section 3146. No material witness shall be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and further detention is not necessary to prevent a failure of justice. Release may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure."[1]

At the hearing of the motion to dismiss on January 21, 1975, an investigator and agent for the Immigration and Naturalization Service testified as to the procedure for detaining, as a witness in a *federal prosecution,* an alien illegally in the country. He said he knew nothing about state court proceedings, and had never handled any proceedings where there was a witness in a state case.

---

[1]Section 3146 of the same title, referred to in section 3149, reads in part:

"(a) Any person charged with an offense, other than an offense punishable by death, shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer, unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required. When such a determination is made, the judicial officer shall, either in lieu of or in addition to the above methods of release, impose the first of the following conditions of release which will reasonably assure the appearance of the person for trial or, if no single condition gives that assurance, any combination of the following conditions:

"(1) place the person in the custody of a designated person or organization agreeing to supervise him;

"(2) place restrictions on the travel, association, or place of abode of the person during the period of release;

"(3) require the execution of an appearance bond in a specified amount and the deposit in the registry of the court, in cash or other security as directed, of a sum not to exceed 10 per centum of the amount of the bond, such deposit to be returned upon the performance of the conditions of release;

"(4) require the execution of a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof; or

"(5) impose any other condition deemed reasonably necessary to assure appearance as required, including a condition requiring that the person return to custody after specified hours."

But not only the right of Velasquez and Arce to release from *State* custody, as opposed to federal custody, is involved in the case at bench.

It is clear from the written and oral arguments of Mejia in the court below that he sought to persuade the trial court Velasquez and Arce were material witnesses because they were the persons responsible for the presence of the marijuana in the house. In his memorandum of points and authorities submitted in support of the motion for production of the witnesses, it is stated:

"THE WITNESSES ARE MATERIAL

"Common knowledge is that most of the marijuana located in San Diego originates from Mexico. Witnesses ARCE and VELASQUEZ were the only ones arrested who appeared to have come from Mexico. Since there is no indication that they were preparing to pick grapes or engage in other activity customary of illegal aliens, the reasonable conclusion is that MR. ARCE and MR. VELASQUEZ probably brought the marijuana to the residence. Thus, they are the ones who can best explain who possessed the marijuana."

At the January 21 hearing, defense counsel made these assertions:

"MR. COHEN: Okay, fine, your Honor. There's the further offer of proof I would make, and that is regardless of what the other witnesses know, there would be evidence to indicate that the two witnesses who know the most about the possession of marijuana would be illegal aliens, because it was in fact their marijuana, so to speak. They are in fact the ones that brought the marijuana into the residence.

". . . . . . . . . . . . . . . . . .

"MR. COHEN: I'm stating I'm offering to prove that.

". . . . . . . . . . . . . . . .

"MR. COHEN: I understand, your Honor. What I'm saying is if the Court had further evidence indicating at least that one witness saw the marijuana in possession of Velasquez and perhaps saw them bring the marijuana into the house—

". . . . . . . . . . . . . . . . .

"MR. COHEN: . . . However, regardless of who's living at the residence, the real question is who possessed the marijuana, and we believe, and I feel that I may be able to produce evidence to indicate that in fact the marijuana belonged to Velasquez and Arce, and therefore those two are in the position where they're most able to offer material evidence as to who possessed the marijuana."[2]

Earlier in the same hearing the following occurred:

"MR. COHEN: Your Honor, it is my belief and understanding that the availability of Mr. Velasquez and Mr. Arce would be most critical, based on two factors: One, as I have stated in my points and authorities, just as a matter of general knowledge the trafficking of marijuana tends to come from the south. The police had available to them the knowledge that Mr. Velasquez has dealt in marijuana before and therefore just as a matter of probability Mr. Velasquez and Mr. Arce had more information about the marijuana, may have brought it up themselves.

"THE COURT: That's all speculation.

"MR. COHEN: That is speculation based on probability.

"If the Court feels that this item is crucial, we believe that we can produce evidence to indicate that in fact these men were known by at least some witnesses to have actually brought the marijuana from Mexico, and were in fact the ones in possession of the marijuana."

If all of that were so, and if the rights of Velasquez and Arce were to be regarded and guarded as well as those of Mejia, the two men would have given no such testimony. "[T]he defendant, as opposed to the witness, has no right which he may assert superior or even equal to that of the witness who exercises the privilege against self-incrimination; the defendant may call the witness; he cannot compromise the witness' testimonial sanctuary to his own uses by using it as a springboard from which to shift the indication of his own guilt. Second, the claim of privilege having no evidentiary value, it could have no relevance to the question of defendant's guilt or innocence." (*People v. Bernal,* 254 Cal.App.2d 283, 294 [62 Cal.Rptr. 96].)

---

[2]No mention of those claims is made in the brief filed by Mejia in this court, which is understandable.

It is inconceivable that the two aliens would be permitted to testify so as to incriminate themselves without warning from the court as to their rights to refuse to answer.

The presence of the transient aliens in the living room of the house did not ipso facto make them material witnesses for the defense as to the possession of marijuana, although they and three others present with Mejia and his wife were also arrested.

Where a conviction has been reversed or an action dismissed because of the failure of the prosecution to make available a possibly material witness, certain elements have been present, and not always the same elements. The principles stated in the cases cited as authorities should not be considered in a vacuum, but in the factual settings that made the principles applicable.

In *People* v. *Kiihoa,* 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673], a criminal charge against the defendant had been dismissed because of the prosecution's refusal to disclose the name of the eyewitness informant allegedly present at a sale of narcotics to an officer; after a five-month interval the charge was refiled; the five months were allowed to run so that the informant could disappear without trace, which he did; his name was then disclosed after he had become unavailable. The defendant's testimony was a denial of the testimony of the officer.

In *People* v. *Kirkpatrick,* 7 Cal.3d 480 [102 Cal.Rptr. 744, 498 P.2d 992], there was a delay in trial as a result of defense counsel's desire to secure witness evidence. The consequent delay in trial was held not to be grounds for dismissal.

*In re Ferguson,* 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234], held that the prosecution should have made available to defense counsel the criminal record of a key prosecution witness, whose testimony could probably have been impeached. The decision may have rested in part upon the failure of defense counsel to attempt to get information about that criminal record.

*People* v. *Goliday,* 8 Cal.3d 771 [106 Cal.Rptr. 113, 505 P.2d 537], and *Williams* v. *Superior Court,* 38 Cal.App.3d 412 [112 Cal.Rptr. 485], again are cases dealing with informants who disappeared (*Goliday*), or as to whose identity disclosure was sought (*Williams*). In those, as in all informer cases, the prosecution fails to make available to the defense the

identity or presence of a person upon whose witness the prosecution has relied.

In *Goliday,* the informants had been present at a sale. In *Williams,* the informant had said he was present when the defendant (a woman) and another person were packaging heroin.

In *Bellizzi* v. *Superior Court,* 12 Cal.3d 33 [115 Cal.Rptr. 52, 524 P.2d 148], after a dismissal of charges against the defendant, they were refiled against him two days later. During those two days, one of the defendant's witnesses apparently left the state after hearing of the dismissal and had not been located since. The court concluded that the unavailability of the defendant's witness "was not attributable to any impropriety on the People's part" (p. 35); and stated, at page 36: "Generally, an accused is not entitled to a dismissal simply because he is unable to produce witnesses assertedly necessary to his defense. [Citation.] The rule is otherwise, however, where it is shown that the prosecution has wrongfully deprived an accused of the opportunity to secure the presence of a material witness. This was made clear in *People* v. *Kiihoa,* 53 Cal.2d 748 . . ., in which we held that it was a denial of due process for the People to defer prosecution of the defendant until a police informant who was a material witness had left the jurisdiction." The court pointed out in a footnote that "the common sense rationale of *Kiihoa*" is "that the People must bear the responsibility of producing their own agents and informants . . . ." (*Bellizzi* v. *Superior Court, supra,* 12 Cal.3d 33, 37, fn. 2 [115 Cal.Rptr. 52, 524 P.2d 148].)

Both *United States* v. *Mendez-Rodriguez, supra,* 450 F.2d 1, and *United States* v. *Tsutagawa, supra,* 500 F.2d 420, upon which primary reliance must be based by Mejia, resemble in one respect the missing informer cases. They are cases in which the missing potential witnesses were of a class upon which the prosecution relied for evidence; all were taken into custody at the same time and under the same circumstances, but not all of that class were treated alike by the prosecution, which had the power to retain them or to deport them; some were retained as government witnesses, the others deported. Another fact in *Mendez-Rodriguez* and *Tsutagawa* is that the illegality of which the deported aliens were guilty was not the same as that with which the respective defendants were charged.

In *United States* v. *Mendez-Rodriguez, supra,* 450 F.2d 1, it was apparent after the trial that the three retained witnesses said they were

picked up by the defendant by prearrangement three hours' walking distance from the international border, from which they had been guided by a man who left them when they came to defendant's station wagon, while the defendant testified he first saw the entire group of six who were in his car at the time of his arrest, in Oceanside, San Diego County, where one of them asked for a ride; the defendant said he had no conversation with the men, and did not know anything about their status as illegal immigrants. Conceivably, some of those deported might have sustained his story. In the *Tsutagawa* case the dismissal was before trial.

There is no suggestion that the prosecution in the case at bench intended to use any of the persons arrested with Mejia as a witness for the People. The names and addresses of all five were given to Mejia, whose counsel did not admit having obtained that information about the three San Diego residents until the hearing on his motion to produce the two deported aliens.

*Elkins* v. *United States,* 364 U.S. 206 [4 L.Ed.2d 1669, 80 S.Ct. 1437], held that the product of a *wrongful* search (of a communications medium) by state authorities could not be used in a federal prosecution, since the constitutional proscription against unreasonable searches had been held to extend to state action.

But *Goliday* did more than affirm the right of a defendant to an opportunity to disclosure of identity of a material witness. Because the full names and addresses of two informers could not be furnished by the police, a charge based on a sale of restricted dangerous drugs at which the informers were present was dismissed. A conviction of the charge of possession based upon the finding, by the police, after a second entry five minutes after the sale and after the informers had left, of caches of 800 narcotic capsules, was affirmed. The court said:

"[W]e find no basis for reversal of the counts relating to possession for sale. Our decision in *People* v. *Garcia, supra,* 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366], requires reversal only upon a failure to disclose an informer who is a material witness on the issue of guilt. The only elements necessary to establish a violation of Health and Safety Code section 11911 are possession of a restricted drug and a purpose to sell it. [Citations.] The record before us establishes both of these elements without reference to anything that the informers might have witnessed while accompanying Officer Nettles during the purported sale.

"Turning first, to the element of possession, we note that the defendant clearly exercised 'dominion and control' over the caches of narcotic capsules found in his apartment. No suggestion appears in the record that 'Frankie' or 'Sue' could have 'planted' the several caches scattered throughout the apartment, and the defense offered no other explanation for the presence of the narcotics.

" . . . If the inference that the defendant possessed the drugs for sale had rested solely on the alleged narcotics transaction with Officer Nettles, the defendant's access to the eyewitness informers might have been crucial to his defense. We face, however, a different case. Here the large quantity of narcotics properly supports an inference that the defendant intended to sell them [citation]. Therefore, the defendant did not suffer a denial of a fair trial by the absence of the informants." (*People* v. *Goliday,* 8 Cal.3d 771, 783-784 [106 Cal.Rptr. 113, 505 P.2d 537].)

Under the principle stated in *Goliday,* the two aliens were not material witnesses. Just as the two informers in *Goliday* were not material witnesses as to the possession of drugs although they had been in the room in which the defendant was present only a few minutes before Goliday was arrested and the store of drugs found, the two aliens here are not shown by anything in the record before the trial court to have been material witnesses, unless by the statements of counsel verbally and in writing that the two aliens were the real villains of the piece.

The dismissal of a criminal complaint because of the failure of the prosecution to produce a person wanted as a witness by the defense is an extreme action. Even when justified, the dismissal must be based upon a reasonable appraisal of the rights involved.

As a matter of practicality there were steps other than a dismissal of the case in the event of a good-faith desire to discover what information the two aliens had.

The defense was furnished with the name, street address and telephone number of each alien in San Luis, Sonora, where the two men were said to live only six blocks from each other.[3]

---

[3]Arce, in fact, possessed a border-crossing card which had expired by the time he was released to the federal authorities.

In making its order requiring their production or a dismissal, the trial court fixed March 10, 1975, as the date for their production, which was nine days before the trial date of March 19, then in effect. That was to allow an opportunity for defense counsel to interview them before attempting to use them as witnesses.

A practical solution in such a situation, when it was not known what if anything the two Mexican residents could say of help to the defense, would be for the investigator to interview them at their place of residence in San Luis, Sonora. San Luis is a border town on the east side of the Colorado River, below Yuma; although the trial judge described it as being in the location of Nogales, Sonora, below Tucson, which is about 500 miles from San Diego, a conference with a prospective witness in Yuma, Arizona would not be considered impossible to a defense investigator or attorney. San Luis is not more than 29 miles from Yuma. A more direct route would be from San Diego to Tijuana, 18 miles distant; to Mexicali, 131 miles from Tijuana; then to San Luis, 38 miles away.

If Mejia was indeed wrongfully deprived by state action of the opportunity to present the testimony of material witnesses for his defense, his good faith or bad faith would be immaterial. If he was not so wrongfully deprived, it is worth while to mention some aspects of the proceeding that suggest the whole matter was a last-minute ploy of the defense, not maintained with complete candor.

Thomas Shannon, employed by defense counsel as an investigator on a permanent basis, testified at the January 21 hearing as to the futile efforts of the defense to obtain the testimony of the two aliens.[4]

---

[4]The chronology of the proceedings was as follows:

August 12, 1974: Mejia, his wife and five others arrested.

August 14, 1974: Complaint filed in municipal court, naming only Mejia and his wife as defendants.

August 14, 1974: Mejia arraigned. An attorney from Defenders, Inc. was present, representing Mejia; another attorney, also with Defenders, Inc. appointed to represent Mejia.

August 15, 1974: Arce deported through Calexico.

August 19, 1974: Velasquez deported.

August 19, 1974: Preliminary hearing set for August 28.

August 22, 1974: Investigator Shannon of Defenders, Inc. inspected district attorney's file; that, he testified later, was first time names of Arce and Velasquez were discovered. He said "No information was available to us prior to that date."

August 28, 1974: Preliminary hearing continued to September 23 at request of Mejia.

September 23, 1974: Preliminary hearing.

October 2, 1974: Information filed in superior court.

October 7, 1974: Mejia arraigned, represented by Defenders, Inc. Readiness conference

He was asked also as to any attempt to interview Grace Contreras, Henry Morena Villegas and Robert Leon, all arrested at the same time as Arce and Velasquez, and all San Diego residents, who had later been released.

*Villegas and Leon, as shown by the testimony of the arresting officer at the preliminary hearing, had been named by the informer as being in the house when the informer was there.*

Shannon said he had not made contact with any of them.

At the motion hearing on January 21, the trial court observed with regard to the three San Diego residents: "Well, I don't know how crucial it is, Mr. Cohen, but it seems to me that the availability of these witnesses to you may be very critical in this case."

Earlier the residence addresses had been read by the district attorney from a report before him. The court had then asked: "Have you been given any information heretofore, Mr. Cohen? The answer to that question was: "Let me ask where you obtained that information." The district attorney then identified the report from which he read. Then defense counsel made a statement, which, with what followed, was:

---

set for November 15, and trial for November 26.

November 5, 1974: Mejia moved to suppress seized marijuana unless identity of informer disclosed.

November 12, 1974: Shannon made additional discovery, the nature of which is not shown by the record.

November 26, 1974: Trial continued to February 4, 1975.

December 13, 1974: Investigator Shannon checked the county jail for Velasquez and Arce and they were not there. Shannon learned they had been released to federal authorities. Shannon later testified the subject had been mentioned by Mr. Cohen (of Defenders, Inc.) before December 13. Also on December 13, Shannon checked with Immigration and Naturalization Service where one Hathaway told Shannon the file showed the two aliens had been sent to El Centro for deportation.

December 21, 1974: Shannon attempted to serve a subpoena on James Tilson of the Immigration and Naturalization Service to produce Velasquez and Arce for the trial. Mr. Tilson was not in and no one else had authority to accept the subpoena.

January 6, 1975: Shannon served a subpoena duces tecum, for the presence of the two aliens, on Mr. Tilson of the Immigration and Naturalization Service.

January 10, 1975: Mejia filed a notice of motion to compel the People to produce material witnesses (Velasquez and Arce) or dismiss.

January 21, 1975: Hearing on above motion.

March 3, 1975: Disposition of above motion; trial set for March 19; People ordered to produce Arce and Velasquez in court on March 10 for pretrial examination by defense counsel.

March 10, 1975: District attorney states inability to produce witnesses; because they could not be compelled to respond to a subpoena, case dismissed.

"MR. COHEN: I would have to say, your Honor, that to my knowledge we haven't been provided with a copy of that report, and the report I have, unless I have missed something, does not have any addresses.

"THE COURT: Did you request Villegas' address? Did you heretofore request information from the district attorney's office on the other three?

"MR. COHEN: Your Honor, it is our understanding and custom of dealing with the district attorney's office that all of their reports will be made available to us, and we understand when our investigators obtain the discovery they have obtained everything available to the prosecution. So the reports we have do list the names of Contreras, Villegas, and George Leon. Our reports do not list any addresses for those individuals."[5]

It seems reasonably inferable that Mejia or his wife must have known of the identity and the availability of the three San Diego residents who were with them in the house in which Mrs. Mejia, at least, lived. It is not beyond the realm of possibility that defense counsel had been furnished with that information, since two different trial dates had previously been set.

---

[5]On January 21, the trial judge made, in conclusion, these remarks, again speaking of Contreras, Villegas and Leon:

" . . . I could do this research, maybe determine the availability of the three local witnesses, and what they have to say is indeed quite critical, in which case I would order the defense undertake its investigation with reference to these witnesses so I could be apprised. If I called for submission of any statements taken from the witnesses, these should be taken in camera, but I don't know whether that's correct because if I dismiss the case and the district attorney appeals me, then what's in those statements should be a part of the record, and the defendant hasn't had jeopardy yet. I think on some Constitutional ground it could be picked out.

"I can't make any assumption whatever as to what these three witnesses—I think it is appropriate, I think the only proper way would be that their testimony be taken in connection with this motion.

". . . . . . . . . . . . . .

"Certainly I think it behooves you at this juncture to get your investigator to work on these three witnesses right now. I don't think I need to say that to you, but if you don't establish—as I indicated before, I think it would be improper for me to consider the statements taken by your investigator in camera and out of the presence of the district attorney. I don't think that's right. I think the appropriate way would be to take their testimony."

The matter was not mentioned on March 3, when the court made its order for the production of Arce and Velasquez. However, the judge's proposal might have involved unpermitted discovery of the testimony of defense witnesses.

The dismissal of the action in the circumstances described has the air of a punishment for the release of the two aliens to the immigration authorities rather than anything in aid of a possible defense.

As to the informer as a material witness for Mejia on the issue of guilt, this may be said: As reported, the informer said only that Mejia was living in the house when the informer was there; no conversation with Mejia was mentioned; it was not said that the informer had seen the marijuana; he had had a conversation with Mrs. Mejia, who told him the marijuana was there and that she and her husband were selling it.

The informer would have been a material witness on the issue of Mrs. Mejia's guilt, and on the question of the reasonableness of the police search of the house.

I would reverse the order appealed from.