**UNITED STATES of America, Plaintiff,**

**v.**

**WINNIE MAE MANUFACTURING CO., dba American Electric Corp., Phillip Purer, Malcolm Willard Sherman, Roy Cruz Escalante, Defendants.**

**No. CR 78–150–AAH.**

United States District Court,
C. D. California.

May 22, 1978.

---

Andrea Sheridan Ordin, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Crim. Div., Mark E. Beck, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff, United States of America.

Mitchell, Silberberg & Knupp by Howard J. Rubinroit, and Edward M. Medvene, Los Angeles, Cal., for defendants Winnie Mae Manufacturing Co., dba American Electric Corp., and Phillip Purer.

Hodge & Dalton by Douglas Dalton, Los Angeles, Cal., for defendant Malcolm Willard Sherman.

Murphy, Thornton, Hinerfeld & Cahill by Timothy M. Thornton, Los Angeles, Cal., for defendant Roy Cruz Escalante.

James R. Dunn, Federal Public Defender by Virginia E. Sloan, Deputy Federal Public Defender, Los Angeles, Cal., for Material Witnesses.

## MEMORANDUM DECISION AND ORDER

HAUK, District Judge.

### FACTS

On January 26, 1978, in a Magistrate's Complaint, defendants Phillip Purer, Malcolm Willard Sherman, and Roy Cruz Escalante, together with two other persons, were charged with harboring and concealing illegal aliens at Winnie Mae Manufacturing Co., dba American Electric Corporation, on January 24, 1978, in violation of 8 U.S.C. § 1324(a)(3).[1]

On February 16, 1978, the Federal Grand Jury returned a three-count indictment against Purer, Sherman, Escalante, and Winnie Mae Manufacturing Co. Count I charges the defendants with conspiracy to harbor and conceal illegal aliens and shield them from detection from an unknown date until January 24, 1978. Count II charged that on December 22, 1977, defendant Winnie Mae, aided and abetted by defendants Purer, Sherman and Escalante, harbored, concealed, and shielded from detection three aliens who were not lawfully within the United States. The charges in Count III are virtually identical to those in Count II, but deal with the date of January 24, 1978, and list six illegal aliens allegedly concealed by the defendants, including two of the three illegal aliens named in Count II.

As part of the alleged conspiracy, Count I alleges, in part, that defendant Winnie Mae designed a false walled chamber and concealed a stairwell hiding place with wood, carpeting, and machinery for use by illegal alien employees. It further charges that defendants Purer and Sherman held meetings of these employees at Winnie Mae whereat they counseled employees to practice hiding while being timed. And finally it charges that defendant Escalante placed numerous illegal alien employees in the hidden stairwell at Winnie Mae during so-called "surveys" by officers of the Immigration and Naturalization Service (I.N.S.), which are actually I.N.S. raids and searches for illegal aliens among the Winnie Mae employees.

Numerous pretrial motions have been made on behalf of the defendants, and the

---

1. (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation . . .

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.
8 U.S.C. § 1324(a)(3).

Court held full hearings thereon. The non-evidentiary motions to suppress and for production of Government attorney's witness interview notes were heard and determined before trial. All the other motions, requiring evidentiary support and opposition, were heard after the jury was picked and trial had begun.

## MOTION TO SUPPRESS EVIDENCE

Defendants moved for an order suppressing all evidence seized, either directly or indirectly, as a result of searches of defendants' premises on December 22, 1977, and January 24, 1978, on the grounds that there was not probable cause for issuance of the search warrant for the December 22, 1977, search, and information in the affidavit for the January 24, 1978, search was obtained during the first search. Having examined the affidavit of I.N.S. agent, Gail Richard Kee, the Court finds that it is sufficient to uphold the magistrate's finding of "probable cause."

■ While a warrant may issue only upon a finding for probable cause, the Supreme Court has long held that the term "probable cause" does not require evidence sufficient to convict, *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813), and that the evidence used in making a finding of probable cause does not have to be admissible in a criminal trial. *Draper v. United States*, 358 U.S. 307, 311, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

The Supreme Court recognized in *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), that the Fourth Amendment's commands, like all constitutional requirements, are practical. Realizing that affidavits for search warrants are normally drafted by nonlawyers in the midst of haste of criminal investigations, the Court stated that search warrants must be tested and interpreted in a common sense and realistic fashion and that the technical and elaborate specificity of common law pleadings are not required in this area.

The Ninth Circuit followed *Ventresca* in *United States v. Lucarz*, 430 F.2d 1051 (9th Cir. 1970). There the Court acknowledged that affidavits for a search warrant are to be interpreted in a common sense and realistic manner.

■ Giving due weight to the preference according to the magistrate's findings in doubtful or marginal cases, *Ventresca, supra*, 380 U.S. at 109, 85 S.Ct. 741; *Lucarz, supra*, at 1055, the Court is compelled to find that probable cause did exist for the issuance of a search warrant for the December 22, 1977, search.

Defendants' motion for an order that any evidence gathered in the second search be suppressed is based upon the ground that the affidavit in support of issuance of the warrant relied upon information obtained in the December 22, 1977, search. Defendants argue that the information obtained illegally in the first search cannot be used to establish probable cause for another search under the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This argument naturally fails because the Court, in ruling upon the sufficiency of the affidavit in support of the first search, found the affidavit met the requirements enunciated in *Ventresca* and *Lucarz, supra*.

## MOTION FOR PRODUCTION OF ATTORNEY'S NOTES OF INTERVIEWS WITH WITNESSES

■ Defendants moved orally for production of notes of witness interviews taken by Government attorneys.

The Supreme Court, in *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976), recently answered questions about construction and interpretation of the Jencks Act, 18 U.S.C. § 3500. The statute provides that in a federal criminal prosecution, after a witness called by the Government has testified on direct examination, the Court shall order the United States to produce any statement, as defined by the Act, which the Government has in its possession. A "statement" is defined by § 3500(e) as "a written statement made by

[a] witness and signed or otherwise adopted or approved by him."

This Court, in its standard order re discovery in criminal cases requires the U.S. Attorney to file with the Court *in camera* all statements of all Government witnesses at least ten days before trial. Additionally, the order requires that such statements be given to defense counsel at least two days before trial.[2]

In the case at bar, Assistant United States Attorney, Mark E. Beck, interviewed witnesses in preparation for trial and took notes of these interviews. However, he did not read these notes back to the witnesses, nor did he allow these witnesses to read the notes. Additionally, Mr. Beck's notes contain speculative answers to questions that were not asked. Mr. Beck did not corroborate these answers by reinterviewing the witnesses.

The Supreme Court in *Goldberg* held that a writing prepared by a Government attorney which has been signed or otherwise adopted or approved by a witness is producible under the Jencks Act. However, in *Goldberg*, the Supreme Court also stated:

"Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500(e)(1), which is satisfied only when the witness has 'signed or otherwise adopted or approved' what the lawyer has written. This requirement clearly is not met when the lawyer does not read back, or the witness does not read, what the lawyer has written." *Goldberg* at 110–11; n.19, 96 S.Ct. at 1348.

Here, the Assistant United States Attorney submitted an affidavit stating that these notes were not adopted or approved by the witness, and defendants have produced no evidence to the contrary. Thus, under the language of *Goldberg* quoted above, the Assistant United States Attorney need not produce the notes.

Defendant's motion for production of notes of witness interviews with the Government attorneys is denied, except for witness statements taken by Government attorneys which have been adopted or approved by the witness.

## MOTION TO DISMISS UNDER STATUTORY EMPLOYERS EXEMPTION

■ Defendants move to dismiss the indictment pursuant to Rule 12(b) Fed.Rules Crim.Pro. on the grounds that 8 U.S.C. § 1324(a)(3) does not charge a crime against the defendants because they are employers.

Defendants argue that Congress has specifically exempted employers from the reach of § 1324(a)(3) through the proviso which states: "Provided, however, That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."

Defendants argue, erroneously, that the proviso is a blanket shield for all employers from prosecution for violations of the Act.

A careful review of the Senate debate of the "Wetback Bill"[3] clearly demonstrates that the proviso is intended to protect employers only "if the normal practices of employment are followed."[4]

Senator Kilgore, responding to Senator Humphrey's query about the purposes of

---

2. The Court's standard Order re Discovery, Rule 1.9 provides:

> 1.9 Witness Statements
> The United States Attorney shall file with the Court in camera (under seal) *all* statements of *all* witnesses to be called by the government in its case in chief. Such statements shall be filed at least ten (10) days before trial.
> Separately from the statements filed under seal, the United States Attorney shall file a list of the statements which shall include the name of the witness, the date of the statement and the name of the person taking the statement.
> Failure to file such statements with the Court may, in the discretion of the Court, preclude the presentation of testimony of any witness whose statement has been previously taken and available to the government.

3. 98 Cong.Rec. 791 (February 5, 1952).

4. Remarks of Sen. Kilgore, 98 Cong.Rec. 793 (February 5, 1952).

the proviso states: " . . . By stating that so long as an employer lets the employee carry on the normal work of his employment and does not make any special effort of any kind to conceal him, that of itself shall not constitute harboring. But if he takes any further steps, such as providing a place for the employee to hide out, that does constitute harboring." [5]

Senator Knowland best explained the intent of the proviso as it applies to the instant case when he stated: "If there is in fact a conspiracy to bring in inadmissable persons knowingly and willfully, those guilty would be subject to the penalty, but if in the normal course of employment one happens to get a wetback in his group, he should not then be penalized for a condition to which he has not been a party except in a nonwillful way." [6]

Defendants cite many cases in their moving papers which they submit stand for the proposition that all employers are exempt from prosecution under the Act.[7] However, none of the cases cited by the defendants stand for the proposition that employers are exempt from prosecution when they go beyond the normal and usual practices incident to employment. In fact, cases provide that employers may be indicted under § 1324(a)(3). *United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974); *United States v. Cantu*, 557 F.2d 1173 (5th Cir. 1977), when their acts go beyond those incident to employment.

■ Here defendants are charged with far more than merely affording shelter to illegal aliens during the usual and normal course of employment. Defendants allegedly constructed and used as a hiding place a hidden stairwell, a false wall for a hiding chamber, and an unmarked building for the hiding of illegal aliens during I.N.S. surveys. Thus, it is clear that the 1324(a)(3) proviso is designed to protect the

employer "who unwittingly, or unknowingly, or thoughtlessly hires a man he does not know to be a wetback . . . ." [8] It does not offer a blanket immunity to all employers, nor does it prevent the Government from indicting these defendants for the instant offenses charged.

## MOTION TO DISMISS FOR UNCONSTITUTIONAL VAGUENESS OF STATUTE

■ Defendants argue that if § 1324(a)(3) is capable of an interpretation which applies to employers, it is impermissibly vague because given the proviso, it is impossible to determine with any amount of certainty what conduct by an employer is allowed and what is forbidden.

Defendants' contention is without merit. Section 1324 prohibits the concealment, harboring, or shielding from detection of any aliens not lawfully within the United States by persons other than employers acting within the usual and normal scope of practices incident to employment.

In *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), the Court stated " . . . a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standard, what is prohibited and what is not. . . ." 382 U.S. at 402–03, 86 S.Ct. at 520–21.

Defendants cannot reasonably contend that their alleged conduct of hiding illegal aliens in a concealed stairwell or behind a false wall could be considered a usual and normal incident to employment or that such conduct was not concealing or shielding from detection the illegal aliens working at Winnie Mae. In *United States v. Cantu*, 557 F.2d 1173 (5th Cir. 1977), appellant Can-

---

5. 98 Cong.Rec. 794 (February 5, 1952).

6. 98 Cong.Rec. 793 (February 5, 1952).

7. *United States v. Ortiz*, 422 U.S. 891, 915, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (White, J. concurring); *United States v. Moreno*, 561 F.2d 1321 (9th Cir. 1977); *United States v. Gonzalez-Hernandez*, 534 F.2d 1353 (9th Cir. 1976).

8. Remarks of Senator Kilgore, 98 Cong.Rec. 794 (February 5, 1952).

tu, also an employer, alleged that the word "shield" in the indictment charging him with violating § 1324(a)(3) was overbroad. The District Court denied Cantu's motion to dismiss the indictment and the Court of Appeals affirmed. In this case also, the defendants have been given fair notice by the statute that the conduct alleged by the indictment is proscribed by the statute. Thus, defendants' motion to dismiss the indictment because 8 U.S.C. § 1324(a)(3) is void in its application to employers is denied.

## MOTION TO DISMISS FOR CLAIMED VIOLATION OF DUE PROCESS IN MAKING PERCIPIENT ALIEN WITNESSES UNAVAILABLE

▮ Defendants move for dismissal of the indictment on the grounds that the Government, by returning eyewitnesses to the offenses for which defendants were charged to Mexico before the defendants had an opportunity to interview them, has denied defendants' Fifth and Sixth Amendment rights to due process and to present a defense.

The first count of the indictment alleges a conspiracy involving corporate defendant Winnie Mae and the individual defendants to harbor and conceal illegal aliens. Count 1 alleges twelve overt acts[9] beginning on May 1, 1976, until January 24, 1978. During this period the I.N.S. conducted numerous surveys (raids) at Winnie Mae to find and arrest illegal aliens. After each survey most of the approximately three hundred and fifty illegal aliens found and arrested were interviewed by I.N.S. agents and re-

turned to Mexico.[10] With the exception of the final survey on January 24, 1978, all but one of the illegal aliens were deported to Mexico.[11]

After the January 24, 1978, survey the Government retained nineteen illegal aliens whom it felt should serve as material witnesses. The other thirty-three aliens arrested were deported to Mexico.

The Court cannot find, and the Government has not offered, a plausible explanation for the deportation of these percipient witnesses to the two substantive counts of the indictment. Of the twenty-six illegal aliens arrested at the time the Count II transaction took place, twenty-two were deported and are unavailable to the defense. Of the fifty-two illegal aliens arrested in the survey on which Count III is based, thirty-three were deported. None of the deported aliens was ever made available to the defendants even though the Government was conducting an active criminal investigation. Thus Government agents interviewed all, or had the opportunity to interview all of the witnesses to substantive offenses. At the same time they were conducting an active criminal investigation and paying Juan Jose Espinosa-Zarasua, an illegal alien, to act as an informer at Winnie Mae. Notwithstanding all of the above, the overwhelming majority of percipient witnesses were deported even though many of their statements to I.N.S. officials were favorable or exculpatory to the defendants.[12]

The defendants have made every conceivable effort to locate the witnesses whom

9. The Government at oral argument moved to strike one overt act of the conspiracy count. The Court, hearing no opposition, granted the motion.

10. The Government has turned over to defendants 375 Record of Deportable Alien forms (hereafter "deportation forms") covering 353 persons. There were 8 persons on the raid lists for whom defendants received no deportation forms, and 8 persons for whom there were deportation forms who were not on the raid lists. One deportation form was received for a certain Colon-Rodriguez, who is not on any raid list and who, according to the form, has no

connection with American Electric. Jorge Encinas-Morales, one of the Government's material witnesses, was neither on the raid lists nor the subject of any of the deportation forms.

11. This person, Juan Jose Espinosa-Zarasua, was a Government paid informant.

12. At least 10 of the 33 deported aliens from the January 24, 1978 survey gave statements which would tend to exculpate the defendants, i. e., that none of the defendants told any person to hide during the I.N.S. surveys.

the government deported.[13] The defendants retained two investigators, a retired F.B.I. Special Agent, and a retired I.R.S. Special Agent who went down to Mexico in an attempt to locate any percipient witnesses deported by the Government. Their efforts to contact any of the witnesses were fruitless. Additionally, defendants sent out 339 letters written in both English and Spanish which explained the witness' connection with the case and requested that they make themselves available, either in Mexico or in the United States, to defendants' counsel. The letter also contained a reply envelope to defense counsel's address.

These letters were sent to the addresses listed on the I.N.S. deportation forms supplied to the defendants by the Government. If no specific address was listed on the I.N.S. form, the letter was sent to the Chief of Police of the city in Mexico listed as that person listed.

In *United States v. Mendez-Rodriguez,* 450 F.2d 1 (9th Cir. 1971) the Government, following the arrest of the defendants for violations of 8 U.S.C. § 1324 returned three of the six percipient witnesses to Mexico. The Government furnished the names and addresses of the witnesses in Mexico to the defendants. In that case also, the defendants sent letters of inquiry to the Chiefs of Police of the cities where the deportees were purportedly residing and, just as in this case, no response from any of the percipient witnesses was forthcoming. However, in that case, unlike the present action, the appellant was unable to show that the missing witnesses' testimony would be favorable to the defense.

The Court held that the right to compulsory process of witnesses in the right to present a defense and that the Government's conduct in making the witnesses unavailable denied the defendant Due Process as guaranteed by the Fifth Amendment.

In *United States v. Tsutagawa,* 500 F.2d 420 (9th Cir. 1974), the defendants were also charged with violations of § 1324(a)(3). The Government initially seized thirty-nine aliens and sent twenty back to Mexico after having them interviewed by the Border Patrol. The remaining nineteen were interviewed by the United States Attorney. Following that interview, six more aliens were returned to Mexico. The remaining thirteen testified before the Grand Jury and after that nine more aliens were released. At no time were the defendants given any opportunity to interview the witnesses prior to their return to Mexico. The defendants also made an unsuccessful effort to locate the returnees in Mexico.

The Court, following *Mendez-Rodriguez,* held that the Fifth and Sixth Amendments prevent the Government from determining for the defense who shall and shall not be a material witness. The Court held that whenever the Government places witnesses who may be favorable to the defendants outside the jurisdiction of the Court and beyond the reach of defendant's compulsory process, the defendants' Fifth and Sixth Amendment rights have been denied.

The Government argues that the Court must consider the importance of the testimony from the absent witness and the degree to which the Government was motivated by self-serving interests in removing the witnesses from the jurisdiction.

This argument is erroneous and fallacious. The Ninth Circuit in *Mendez-Rodriguez* recognized that the appellant had made no showing of the substance or importance of the absent witnesses' testimony. "Appellant couldn't know what these witnesses might say, if anything. We are in the same position as the appellant. We decline to indulge in any speculation that the interviews would, or would not, have been fruitful to the defense." 450 F.2d at 5. Also in *Mendez-Rodriguez,* there was no showing of bad faith or misconduct by the Government. Indeed, just the opposite was shown by the dissenting opinion of Circuit Judge Kilkenny who stated: "There is absolutely nothing in the record to suggest . . . misconduct or . . . negligence of the government." *Id.* It is clear that the defendants need not make any

---

**13.** *United States v. Moran,* 456 F.2d 1066 (9th Cir. 1972).

showing of prosecutorial bad faith or of the relevancy of the missing witnesses' testimony.

Finally, the Government argues that application of the *Mendez-Rodriguez* rule would burden the Government with ". . . soaring costs involved in retaining aliens until they have been interviewed," *Tsutagawa, supra,* at 423. However, *Tsutagawa* clearly states that retention of the aliens does not necessarily mean incarceration with all of the concomitant costs of incarceration. The Court expressly pointed out that their decision was not meant to foreclose alternatives to incarcerating the illegal aliens and indeed suggested "parole or farmout methods of retention." *Tsutagawa, supra,* at 423. The government is aware of these alternatives, and was using them before *Tsutagawa.* In *Mendez-Rodriguez* the witnesses which the Government retained were placed as workers on farms one hundred and fifteen miles from San Diego. They remained on the farm until the trial. One half of the wages earned by the witnesses were paid currently. The balance of their wages were retained by the Government and paid to the witnesses when they appeared at the trial. Thus the Government is not burdened by any requirement of incarceration of the illegal aliens. Rather, it is the duty of the Government to not remove them from the jurisdiction and out of the reach of the defendants' compulsory process. The Government having failed in that duty, leaves the Court with no alternative but to dismiss the indictment.

## MOTION TO DISMISS FOR PREINDICTMENT DELAY

Defendants also moved for dismissal of the indictment on the grounds that they have been substantially prejudiced by the Government's unreasonable delay in bringing an indictment in this case and that the delay violates the defendants' Due Process rights as guaranteed by the Fifth Amendment.

From May 28, 1976, to January 24, 1978, the I.N.S. conducted six surveys upon de-fendants' premises, apprehending a total of approximately three hundred seventy-nine illegal aliens. Defendants argue that the Government's delay in bringing the indictment exacerbated their inability to gather exculpatory evidence. *United States v. Mendez-Rodriguez,* 450 F.2d 1 (9th Cir. 1971).

The Government argues that the Supreme Court has held that prosecutors are under no duty to file charges as soon as probable cause exists, but instead are encouraged not to seek indictments until the prosecutor is satisfied that he can prosecute and establish guilt beyond a reasonable doubt. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Mays,* 549 F.2d 670 (9th Cir. 1977) (Ely, J., dissenting); *United States v. Erickson,* 472 F.2d 505 (9th Cir. 1973).

The Court having already dismissed the indictment because the defendants were denied their rights guaranteed by the Fifth and Sixth Amendments as outlined in *Mendez-Rodriguez* makes the instant motion moot. *See De Funis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

## IMPORTANT ADDENDUM

After the oral hearing on these motions and the Court's oral decision, after the jury was picked, to grant defendants' motion to dismiss the indictment, the Court became aware of the recent amendments to rule 12(e) of the Federal Rules of Criminal Procedure and the legislative history thereof, including Report of the House Committee on the Judiciary, H.R.Rep.No. 94–247, 94th Cong., 1st Sess. 8, [1975] U.S.Code Cong. & Admin.News, pp. 674, 680. These indicate that the determination of pretrial motions should be made before the Court picks a jury and before double jeopardy attaches so as not to deprive the government of the right to appeal. Unfortunately, neither side had advised the Court of these amendments to Rule 12(e) prior to the Court's ruling. Had the Court been aware of these 1975 Amendments to Rule 12(e) and the legislative history thereof, and cases such as *U. S. v. Appawoo,* 553 F.2d 1242 (10th Cir.

1977), the Court would certainly have heard and determined the motions prior to the picking of the jury.

Nonetheless, the Court finds this distinction inconsequential in this case. To be faced with this case again for another trial, and to be forced to determine the motion to dismiss *before* the jury is picked, would be an exercise in futility, because the Government, as more fully discussed hereinabove in this Memorandum Decision, has already deported approximately two-thirds of the illegal alien percipient witnesses without giving the defendants an opportunity to question or interview them. *See United States v. Mendez-Rodriguez,* 450 F.2d 1 (9th Cir. 1971). Thus, the issue of whether the Court should have heard the motions *before* picking the jury or, as it did, *after* picking the jury is academic and moot, since the Court will necessarily have to hold the same identical hearing on the unavailability to defense counsel of percipient illegal alien witnesses prior to empanelling a jury and necessarily reach the same result, if the case should be returned for a new trial following any successful Government appeal on this Rule 12(e) issue.

LET JUDGMENT BE ENTERED ACCORDINGLY.