UNITED STATES of America,
Plaintiff-Appellee,

v.

Juan LUJAN–MIRANDA,
Defendant-Appellant.

No. 76–1398
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

July 19, 1976.

Rehearing Denied Aug. 16, 1976.

Max E. Ramsey, Odessa, Tex., for defendant-appellant.

John E. Clark, U. S. Atty., Ronald P. Guyer, LeRoy Morgan Jahn, San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, GEE and TJOFLAT, Circuit Judges.

GEE, Circuit Judge:

Juan Lujan-Miranda was found guilty of possession of marijuana and of conspiracy to possess and distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846. He brings this appeal complaining that the original stop of his vehicle was illegal and that the evidence is insufficient to sustain his conviction.

About 10:00 a. m. on July 2, 1975, Border Patrol officers stopped appellant's pickup truck five miles south of Marfa, Texas. The pickup lacked the front license plate required in Texas, and information transmitted by Chekar and geophone de-

---

* Rule 18, 5th Cir.; *Isbell Enterprises, Inc. v. Citizens Cas. Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

vices indicated that the pickup was coming from an uncontrolled area of the Texas-Mexico border. The officers stopped the pickup to verify the citizenship of its occupants. While one officer inquired, the other assumed a covering position in a barrow ditch several feet lower than the roadway. From this vantage point, he noticed two Mexican sugar sacks tied beneath the truck over the rear axle housing. Suspicious of their unusual location, the officer decided to investigate. He opened one sack and determined that it contained marijuana. The two occupants[1] of the car were then arrested, and a subsequent search revealed 148 pounds of marijuana. Since the government concedes that the pickup was not intercepted at a functional equivalent of the border, we must ask if the officers had reasonable suspicion for making the stop as required by *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

> Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual pattern of traffic on a particular road, and previous experience with alien traffic are all relevant. [citations omitted] They also may consider information about recent illegal border crossings in the area. . . . Aspects of the vehicle itself may justify suspicion. . . . In all situations the officer is entitled to assess the facts in light of his experience detecting illegal entry and smuggling. [citations omitted]

95 S.Ct. at 2582.

▮▮▮ Marfa, Texas is approximately 49 miles from the Mexican border at its closest point. Farm-to-Market Road 2810, on which appellant was travelling, forms the northwesterly side of a triangular-shaped area, with Marfa at its apex and the Rio Grande River as its base. Running south-west from Marfa approximately 54 miles to Ruidoso, Texas, FM 2810 is paved for 30 miles and then deteriorates into a poorly maintained dirt road known as Pinto Canyon Road for the last 24 miles into Ruidoso. The easterly leg of the triangle is formed by U. S. Highway 67, which extends 60 miles from Marfa south-southwest to Presidio. Along the Rio Grande River runs Farm Road 170 connecting Presidio with Ruidoso. The interior of this triangle is rough terrain crossed by three mountain chains. This topography makes vehicular traffic virtually impossible except along the constructed roads, effectively isolating the river-border area from Marfa except by road. The only other roads in the area serve local branches and are controlled by locked gates.

There are three points of entry into Texas from Mexico along this remote and isolated stretch of the border, Ruidoso, Candelaria, and Presidio. Ruidoso and Candelaria are unmanned Class B ports of entry—which are actually fords of the Rio Grande River with no permanent Border Patrol personnel stationed in either village. Presidio is the only Class A, continuously-manned port of entry into the area which provides a bridge crossing of the river. Legitimate northbound traffic from Mexico into Texas usually enters through Presidio and proceeds north on Highway 67 to Marfa. On the other hand, FM 2810 carries mainly local traffic and had had a high incidence of use as an artery to the interior by illegal aliens. In effect, FM 2810 is the spout of a funnel formed by over 60 miles of unpatrollable river and impassable mountains through which the stream of illegal aliens is channeled up Pinto Canyon Road and poured into the interior. Fifty-eight illegal aliens and twenty-four principal alien transporters were apprehended on the road within the seven weeks before the stop of appellant's pickup.

A Chekar intrusion device is buried in Pinto Canyon Road some 20 miles north of

---

1. The other defendant, Hector Guadalupe Arevalo-Sanchez, failed to appear in court, and his trial was severed.

Ruidoso. The Border Patrol has other intrusion devices called geophones located on the paved portion of FM 2810. If the Chekar and the geophone devices are both tripped, Border Patrol officers are sent out to intercept the vehicles in order to determine the citizenship of the occupants.[2] If, however, the vehicle is recognized as a local vehicle or the occupants are recognized as local residents, the vehicle is waived on without inquiry.

Appellant's vehicle was stopped after both the Chekar and geophone devices had alerted the Border Patrol in Marfa that a vehicle was proceeding north on FM 2810 from an uncontrolled river area near the border. The officers were not familiar with the pickup. Only two to ten vehicles travel on FM 2810 daily, and the officers could identify most of the local vehicles and occupants. The pickup lacked the front license plate required by Texas and thus was likely to be registered in the State of Chihuahua, Mexico, or New Mexico, neither of which requires such a plate.[3]

The fact that the intrusion devices had been set off at a time of day when there was virtually no northbound traffic on the road permitted a rational inference that the pickup had come from an uncontrolled river area. The volume of illegal alien traffic on FM 2810 and the officers' unfamiliarity with either the vehicle with out-of-state license plates or the occupants, who were of Mexican-American descent, gave the officers a reasonable suspicion that the approaching pickup contained aliens illegally in the country, so that a stop was warranted to determine the citizenship of the pickup's occupants. These are the very factors that *Brignoni-Ponce* advised officers to take into account before stopping a vehicle: the characteristics of the area, proximity to the border, pattern of traffic on the particular road, and previous experience with alien traffic.[4] *See United States v. Estrada*, 526 F.2d 357 (5th Cir. 1976); *United States v. Walker*, 522 F.2d 194 (5th Cir. 1975).

Appellant challenges the initial stop of the vehicle and the sufficiency of the evidence. Finding the stop to be based on articulable facts leading to a reasonable suspicion that the vehicle was transporting aliens, and finding sufficient evidence to sustain the conviction, we AFFIRM.

---

2. The Border Patrol knows the distance between the Chekar buried in the Pinto Canyon Road and the first geophone located on FM 2810 and can approximate how long it takes after activating the Chekar for a northbound vehicle to enter FM 2810 and activate the first geophone. The geophone transmits a signal on a different radio frequency than the Chekar to a computer in Marfa which, after processing these signals, prints out the time, place and type of intrusion that has activated the geophone. When appropriate, the computer calculates an interception point.

3. The pickup was registered in New Mexico, but this was determined only after the stop.

4. The fact that the occupants were of Mexican ancestry was not determinative. The officers testified that they noticed the characteristics of the occupants only as the car was slowing to a stop. They further testified that if they had recognized these occupants as local workers they would have waved them on without inquiry.