UNITED STATES of America,
Plaintiff-Appellee,

v.

Antonio HERNANDEZ–GONZALEZ,
Defendant-Appellant.

No. 77–1504.

United States Court of Appeals,
Ninth Circuit.

Oct. 31, 1979.

---

Joseph Milchen, San Diego, Cal., for defendant-appellant.

Sandra J. Wittman, Asst. U.S. Atty. (on the brief), Terry J. Knoepp, U.S. Atty., Sandra J. Wittman, Asst. U.S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before TRASK, WALLACE and ANDERSON, Circuit Judges.

TRASK, Circuit Judge:

Antonio Hernandez-Gonzalez appeals his conviction of a violation of 8 U.S.C. § 1324(a)(2), transporting aliens illegally within the United States. We affirm.

Appellant was apprehended on December 29, 1976, by Agents Hemley and Gilford of the United States Border Patrol. On that day, Agent Hemley was observing northbound traffic on De Luz Canyon Road near Murietta, California. The area is about 60 miles north of the Mexican border and the road under observation is one that bypasses the Temecula Border Patrol checkpoint on Interstate 15.

Sensors placed along the road leading from Mexico with monitoring equipment in Hemley's car signaled the approach of two cars, traveling close together. Two cars exited the canyon about three car lengths apart and passed within 10 to 12 feet of Hemley's marked vehicle. Each car had two visible occupants, and, according to Hemley, all four were of Latin descent. Appellant was driving the lead car, and Hemley described that car as riding "heavy."

Appellant looked straight ahead as his automobile passed Hemley, and his passenger straightened up and looked straight ahead. The passenger in the second vehicle turned and said something to the driver; the second vehicle then slowed down and fell further behind the lead car.

Agent Hemley, having worked in the De Luz Canyon area for nine years, was fairly familiar with the residents and their vehicles, but he had never seen these two vehicles or their occupants. Hemley testified that approximately 100 cars travel the road each day, and he and his partner stop about 50 percent of the northbound traffic and find illegal aliens approximately 80 to 90 percent of the time.

Hemley radioed ahead to his partner, Agent Gilford, who stopped the first car, while Hemley stopped the second car. After being stopped, appellant advised Gilford that there were four more persons in the trunk of the car. All of them were illegal

aliens, as was the passenger in the front seat.

Subsequently, only four of the five aliens were retained in the United States as material witnesses. The fifth alien apparently convinced another alien at the detention center to reveal to him information, such as his mother's maiden name and the addresses of his parents, which was used by the authorities for identification purposes in releasing illegal aliens. Consequently, the fifth alien was able to deceive border patrol officers by impersonating the other alien who was qualified as one to be voluntarily returned to Mexico.

Appellant raises four issues on appeal: (1) Did the Border Patrol Agents have reasonable suspicion to stop appellant's vehicle? (2) Did the government violate appellant's right of confrontation by allowing a material witness, the fifth illegal alien found in appellant's car, to return to Mexico? (3) Was appellant's right of confrontation abridged by the district court's curtailment of further cross-examination concerning the location of the sensor devices? (4) Did the verdicts of acquittal on two of the counts constitute a finding that there was an essential element of the offense that had not been proved beyond a reasonable doubt to the extent that the verdicts of guilty on the remaining two counts are improper?

By order of the court, oral argument was limited to the single issue of whether the district court committed reversible error in failing to dismiss due to the return to Mexico of the fifth alien, Flores-Bravo. The argument was to include whether the government properly exonerated any duty it may have had in maintaining custody of Flores-Bravo and, if not, whether Hernandez-Gonzalez was prejudiced, and if not prejudiced, whether such lack of demonstrated prejudice should result in affirmance of the judgment of the trial court. We address ourselves, however, to each of the four issues raised by appellant.

I

Roving border patrol officers may stop vehicles and inquire as to the citizen-

ship and immigration status of its occupants if the officers have a "reasonable suspicion" that the vehicle contains illegal aliens. *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Because of the limited nature of the intrusion, such stops are justified on facts that do not rise to the level of probable cause required for an arrest. *Id.* at 880, 95 S.Ct. 2574. However, the reasonable suspicion must be based on "specific articulable facts, together with rational inferences from those facts." *Id.* at 884, 95 S.Ct. at 2582.

The court in *Brignoni-Ponce* suggests the following factors that may be taken into account in judging whether the reasonable suspicion standard has been satisfied: (1) Characteristics of the area; (2) Proximity to the border; (3) Usual patterns of traffic on the particular road; (4) Officer's previous experience with alien traffic; (5) Information regarding recent illegal border crossings in the area; (6) Driver's behavior (e. g., erratic driving or obvious attempts to evade officers; (7) Aspects of the vehicle itself, such as the load of the vehicle, large compartments for folddown seats or spare tires, an extraordinary number of passengers, or passengers trying to hide; (8) Appearance of the occupants, such as mode of dress or style of haircut, which would indicate they reside in Mexico. *Id.* at 884–85, 95 S.Ct. 2574.

A consideration of these factors clearly demonstrates that there are a sufficient number of specific articulable facts along with rational inferences from those facts to warrant a reasonable suspicion that the vehicles involved in this case contained illegal aliens. The lack of proximity to the border was compensated for by the availability and frequent use of the particular road to bypass the fixed checkpoint on Interstate 15 at Temecula. In addition, there was obviously a good deal more than the Latin appearance of the occupants: the "heavy" ride of the first car, the two cars traveling in tandem and separating on sight of the patrol car (see, *e. g., United States v. Garza,* 544 F.2d 222 (5th Cir. 1976)), the traditional use of the road for smuggling, and the inability of the experienced agent to recognize the vehicles or occupants on a lightly traveled road (see, *e. g., United States v. Lujan-Miranda,* 535 F.2d 327 (5th Cir. 1976)). We hold the stopping of the vehicles was justified.

## II

Appellant contends that he was denied his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process when the fifth illegal alien, who was a passenger in his car, was able by a ruse to obtain his return to Mexico. He relies on *United States v. Mendez-Rodriguez,* 450 F.2d 1 (9th Cir. 1971) to support his position.

In *Mendez-Rodriguez,* appellant was convicted of conspiracy to smuggle aliens into the United States and of transporting illegal aliens within the Southern District of California. The court held that the action of the government in returning three of the six aliens found in appellant's car to Mexico, without first giving appellant an opportunity to interview them and if the interview proved favorable to appellant's defense to subpoena them for appearance at appellant's trial while they were still in the jurisdiction of the court, deprived appellant of his Fifth Amendment right to due process and his Sixth Amendment right to confrontation. Moreover, the court expressly held that appellant need not show that the witnesses in question would have offered favorable testimony.

The holding in this case rests on the fact that the witnesses were made unavailable by the unilateral act of the government in returning them to Mexico. The court quotes language from an earlier Ninth Circuit opinion which indicates that the defendant's Constitutional rights are violated whenever "witnesses [are] made unavailable through the suggestion, procurement, or negligence of the [government]." *Ferrari v. United States,* 244 F.2d 132, 141 (9th Cir.), *cert. denied,* 355 U.S. 873, 78 S.Ct. 124, 2 L.Ed.2d 78 (1957).

The holding in *Mendez-Rodriguez* was adopted in *United States v. Tsutagawa,* 500 F.2d 420 (9th Cir. 1974). There, the court held that where the government deported 35 of 39 apprehended aliens to Mexico before the appellants, two ranch foremen who were charged with harboring and concealing them, could interview them, the appellants were denied their Fifth and Sixth Amendment rights of due process and compulsory process. The court reasoned:

> *Mendez-Rodriguez* prevents the government from determining who will be a helpful witness for the accused. The accused (or here, prospective accused) has the right to make that decision for himself, either by interviewing the potential alien witnesses or by waiving the right to do so. 500 F.2d at 423.

In further explanation of the rationale of *Mendez-Rodriguez* and the holding of this case, the court states:

> The trust of *Mendez-Rodriguez* is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant. The vice lies in the unfettered ability of the government to make the decision unilaterally. *Id.* (Citations omitted).

The holdings of these two cases are based on the government's action in making the witnesses unavailable. There are essentially two basic grounds upon which the cases following *Mendez-Rodriguez* are distinguished: (1) The unavailability of the witnesses is not the result of unilateral government action; (2) The unavailability of the witnesses is not prejudicial to the defendant.

An analysis of Ninth Circuit cases indicates that *Mendez-Rodriguez* does not apply unless the unavailability of the witnesses is the result of unilateral, overt action by the government. In *United States v. Peyton,* 454 F.2d 213 (9th Cir. 1971), appellant was convicted of transporting illegal aliens in violation of 8 U.S.C. § 1324. Relying on *Mendez-Rodriguez,* appellant claimed preju-

dice by "failure of the government to produce one of the four aliens transported." 454 F.2d at 214. The court held that *Mendez-Rodriguez* was inapplicable because the unavailability of the witness was not due to government action. Specifically, the court stated: "[I]n *Mendez-Rodriquez* the government apparently 'returned' the witness to Mexico. Here the record is silent. So we do not know what happened to the missing alien. And we should not speculate." 454 F.2d at 214.

In *United States v. Verduzco-Macias,* 463 F.2d 105 (9th Cir. 1972), it was also determined that the witnesses were not made unavailable by overt government action. The court stated:

> *Mendez-Rodriguez* is different from the cases before us. After the aliens involved in *Mendez-Rodriguez* and in these cases were discovered unlawfully within the United States by the border patrol agents, the government had three alternatives: (1) charge the aliens with violation of 8 U.S.C. § 1325; (2) deport them immediately under 8 U.S.C. § 1251; or (3) allow them to remain in this country until the trials, and then deport them. With respect to the aliens involved in *Mendez-Rodriguez,* the second course was chosen; with respect to the aliens involved in the cases before us, the third course was chosen. The government did not itself take action which would remove the witnesses from the subpoena power of the court. In fact, the government took positive steps in order that the aliens would be available to testify at appellants' trials; they were farmed out and half their pay withheld pending their appearances at the trials. 463 F.2d at 106.

The release of two of nine illegal aliens before the appellant could interview them was held not to be the result of government action and therefore not violative of appellant's Constitutional rights in *United States v. Carrillo-Frausto,* 500 F.2d 234 (9th Cir. 1974). The court reasoned:

> The present case is clearly distinguishable [from *Mendez-Rodriguez*]. *Mendez-Rodriguez* involved the unilateral decision of

the *prosecution,* in effect, to suppress evidence. In the instant case the *court,* in its discretionary power to release alien witnesses and out of concern for the welfare of two juvenile aliens, aged 13 and 16, refused to subject them to criminal process." 500 F.2d at 235.

In that case the witnesses were released, *over objection of the government,* because of apparent unavailability of adequate detention facilities for minors.

In *United States v. Francisco-Romandia,* 503 F.2d 1020 (9th Cir. 1974), 31 aliens were discovered in a residence which officers entered with probable cause to believe it was being burglarized. Appellant was not in the house but his codefendants were arrested there. An indictment was returned against appellant, but he was not apprehended until a month later. In the meantime two codefendants stipulated with the government to release all of the alien witnesses except nine. The court held that the "elements of unfairness in *Tsutagawa* and *Mendez-Rodriguez* are absent here."

"The aliens were released not by the unilateral action of the Government, but by stipulation followed by a court order. The released witnesses were under subpoena. At the time they were released, appellant was a fugitive." 503 F.2d at 1021.

Moreover, the court stated that "[n]o abuse of discretion appears in failing to detain all material witnesses in custody for the benefit of an unapprehended defendant who may some day be caught and who may then want to interview them at his convenience." *Id.*

*Mendez-Rodriguez* has also been held to be inapplicable where the unavailability of the witness is not determined to have been prejudicial to appellant. In *United States v. Romero,* 469 F.2d 1078 (9th Cir. 1972), appellant was convicted of burning a barracks at the El Centro Detention Center. He later claimed that he could substantiate alibis from among the detainees at the facility. The detainees were deported without the appellant having interviewed any of them as potential witnesses. The court

found that the appellant was afforded a fair opportunity to investigate, designate and interview potential witnesses before they were deported and therefore his Constitutional rights were not violated. The deportation of the potential witness did not prejudice the appellant in this case, and, therefore, *Mendez-Rodriguez* does not apply.

In *United States v. Lomeli-Garnica,* 495 F.2d 313 (1974), the appellant was convicted of importing from Mexico and possessing with intent to distribute marijuana. Another person was arrested with the appellant but the decision was made not to prosecute him. This person was available to counsel for appellant for a week before he was released, but no effort had been made to interview him before such release. The potential witness was not an illegal alien and was not deported by the government. Under these circumstances, the court held that failure to detain such person did not deprive appellant of his Constitutional rights under the Fifth and Sixth Amendments. The court reasoned that to detain him after the decision was made not to prosecute would have imposed on him a substantial hardship for only a remote possibility of benefit to the defendant.

*Mendez-Rodriguez* was held to be inapplicable to *United States v. McQuillan,* 507 F.2d 30 (9th Cir. 1974), because the alleged witnesses were found to have had nothing to do with the crime for which the defendants were convicted. In that case the defendants were convicted of possessing marijuana with intent to distribute. Defendants were flushed from hiding places along the Border Park Beach together with four Mexican aliens. It was determined that the aliens just happened to be crossing the beach at the same time the defendants were and that they had nothing to do with the marijuana found near the defendants. Consequently, the aliens were returned to Mexico. Because there was no prejudice to the defendants by the release of the aliens, *Mendez-Rodriguez* does not apply. *See also United States v. Ballesteros-Acuna,* 527 F.2d 928 (9th Cir. 1975); *United States v.*

*Castellanos-Machorro,* 512 F.2d 1181 (9th Cir. 1975); *United States v. Heiden,* 508 F.2d 898, 902 (9th Cir. 1974); *United States v. Sewar,* 468 F.2d 236 (9th Cir. 1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973).

In the instant case, the government made every effort to retain all five of the material witnesses. The usual extent of the government's obligation in aiding the defense to obtain witnesses is a "reasonable effort." *See, e. g., Tapia-Corona v. United States,* 369 F.2d 366 (9th Cir. 1966). The vital data identification technique used by the detention facility to retain and release the proper aliens is clearly reasonable even if not totally failsafe. This is especially true given the large number of aliens being processed and the difficulty of identifying them at the detention center.

In *Mendez-Rodriguez* there was evidence of a systematic program of shipping back to Mexico all but three or four witnesses, no matter how many were originally detained. In the system employed in this case, there was no deliberate nor even negligent selective retaining and returning of material witnesses as was present there. The release of the fifth illegal alien was not the result of government action or negligence, but, rather, was the result of his own trickery in impersonating another alien who was to be properly released. This trickery by impersonation of another alien who was to be released also distinguishes this case from *United States v. Loud Hawk,* Nos. 76–1906, 76–2127, —— F.2d —— (9th Cir. Aug. 7, 1979).

In *Loud Hawk,* dynamite was exploded by State Police Officers for reasons of public safety without participation on the part of federal government officials. The court held that the secondary evidence of the contraband consisting of photographs of the dynamite and testimony of state police officers was sufficient to establish lack of participation on the part of federal officers in a federal prosecution on the basis of destruction of evidence. The secondary evidence was therefore admissible.[1]

Equally significant to the lack of government involvement in this is the remote possibility of prejudice. Because appellant virtually stipulated to the presence of the aliens in his car, the only element of the offense remaining was his knowledge that they were illegal aliens. The only evidence on this point is the stipulated statements of two of the passengers that appellant met them in Mexico and agreed to smuggle them across for a fee. The only possible benefit that the testimony of the fifth alien could provide would be to rebut these witnesses. Yet appellant waived his right to cross-examine them. Since he made no effort to undermine their testimony either through cross-examination or direct testimony, it is hardly compelling to penalize the government for the release of the alien that they in fact tried to retain.

### III

■ Appellant also complains that the trial judge improperly prevented him from questioning the border patrol agent as to the location of the sensors in De Luz Canyon which first revealed the presence and relationship of the two cars. His initial purpose at trial was clearly to ascertain whether or not any trespass had been committed in the placement of the sensors. He now also claims that this was merely a preliminary inquiry to aid in the determination that there had been "in fact a fourth amendment violation." His argument is frivolous.

The government properly points out that he had no standing to contest any alleged trespass, for no discernible privacy interest of his was invaded in its commission. *See, e. g., Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1967). Moreover, we can conceive of no other possible Fourth Amendment violation

---

1. The order of submission entered in this case was vacated pending a decision by the United States Court of Appeals for the Ninth Circuit (En Banc) of *United States v. Loud Hawk,* Nos. 76–1906 and 76–2127, —— F.2d —— (9th Cir. Aug. 7, 1979), at which time this case was automatically resubmitted.

he could have been pursuing. He was riding in a car on a public highway and his privacy was no more invaded by a sensor detecting his presence than it was by the border patrolman observing him a short time later.

He might have wanted this information for other purposes, e. g., to establish that the sensors really existed, but, on the basis of the objection asserted at trial and here, it cannot be said that the trial judge abused his discretion.

### IV

The final contention on appeal is that the trial judge's verdicts were inconsistent. The trial judge convicted appellant of two of the counts and acquitted him of two. Appellant claims that the acquittal on the latter two counts indicates that an essential element of the crime was missing as to all four.

Appellant's argument is nonsense. As noted earlier, the only real issue in the case was whether the appellant had reasonable grounds to believe that his passengers were illegal aliens who had entered the country within the last three years. The only evidence as to this point was supplied by the stipulated statements of two of the four passengers that appellant had met them in Mexico and agreed to transport them across the border for a fee. Appellant was convicted on the two counts involving the illegal transportation of these two aliens; as to the other two aliens, about whom there was no evidence on this issue, he was acquitted. Nothing could have been more proper.

The judgment is AFFIRMED.

WALLACE, Circuit Judge, concurring:

I join in the majority opinion except for the issue as to whether Hernandez-Gonzalez was prejudiced due to the absence of the fifth alien. While the law was properly stated by the majority, I would not reach the issue. The unavailability of the alien was not due to the unilateral action of the government and on that basis alone, Hernandez-Gonzalez's *Mendez-Rodriguez* claim is flawed.