### ROGER LUBESKY *v.* GEORGE BRONSON, WARDEN
### (13650)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued October 6—decision released November 28, 1989

*Martin Zeldes,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (petitioner).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *Bradford J. Ward,* assistant state's attorney, and, on the brief, *John Connelly,* state's attorney, for the appellee (respondent).

COVELLO, J. This is an appeal from a decision of the trial court denying the petitioner's application for a writ of habeas corpus and rendering judgment for the respondent. The dispositive issue is whether the state

deliberately concealed an eyewitness-victim during the presentation of the petitioner's defense at his trial for murder. We conclude that the habeas court did not err in finding that the petitioner had not met his burden of proof on this claim.

On September 1, 1979, at approximately 1:45 a.m., someone entered the Waterbury apartment shared by Thomas Radke and Patricia Reagan and shot them both in the head. Reagan died as a result and Radke sustained five bullet wounds in the head and neck.

On November 20, 1979, a grand jury returned a true bill on a two-part information charging Roger Lubesky with murder in the first degree in violation of General Statutes § 53a-54a[1] and assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[2] The petitioner was tried and found guilty by a jury of twelve.

---

[1] General Statutes (Rev. to 1979) § 53a-54a provided: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony unless it is a capital felony and the death penalty is imposed as provided by section 53a-46a."

[2] General Statutes (Rev. to 1979) § 53a-59 (a) (1) provided: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

The petitioner was also convicted of being a persistent felony offender in violation of General Statutes § 53a-40 (a).[3] On August 15, 1980, the trial court, *Stoughton, J.,* sentenced the petitioner to an effective term of imprisonment of forty years to life.[4]

On March 19, 1985, on direct appeal to this court, the judgment of the trial court was affirmed in *State* v. *Lubesky,* 195 Conn. 475, 488 A.2d 1239 (1985). At that time we declined, for lack of an adequate record, to review the claim now raised by the petitioner that a due process violation had occurred because the state had deliberately concealed the eyewitness-victim Radke when defense counsel sought to recall him to the witness stand as a defense witness. *State* v. *Lubesky,* supra, 480. On May 20, 1985, the petitioner filed a peti-

---

[3] General Statutes (Rev. to 1979) § 53a-40 (a) provided: "PERSISTENT OFFENDERS: DEFINITIONS; DEFENSE; AUTHORIZED SENTENCES. (a) A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault, in the first or third degree, sexual assault in the first or third degree with a firearm, robbery in the first or second degree, or assault in the first degree; and (2) has been, prior to the commission of the present crime, convicted and imprisoned, under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution for any of the following crimes: (A) The crimes enumerated in subdivision (1), the crime of murder, or an attempt to commit any of said crimes or murder; or (B) prior to October 1, 1975, any of the crimes enumerated in sections 53a-72, 53a-75 or 53a-78 of the general statutes, revision of 1958, revised to 1975, or prior to October 1, 1971, in this state, assault with intent to kill under section 54-117, or any of the crimes enumerated in sections 53-9, 53-10, 53-11, 53-12 to 53-16, inclusive, 53-19, 53-21, 53-69, 53-78 to 53-80, inclusive, 53-82, 53-83, 53-86, 53-238 and 53-239 of the general statutes, revision of 1958, revised to 1968, or any predecessor statutes in this state, or an attempt to commit any of said crimes; or (C) in any other state, any crimes the essential elements of which are substantially the same as any of the crimes enumerated in subdivision (1) or (2)."

[4] The petitioner received a sentence of twenty-five years to life on the murder charge, and a consecutive sentence of fifteen years to life on the assault in the first degree charge, for a total effective sentence of forty years to life.

tion for a writ of habeas corpus, which was later amended on September 5, 1985.

The amended petition alleged, inter alia, that the petitioner's constitutional right to due process under the fifth, sixth and fourteenth amendments to the United States constitution and under article first, § 8 of the Connecticut constitution had been violated by the state's misleading statements regarding the whereabouts of Radke during the petitioner's trial, by the state's failure to disclose to the petitioner, at or before his trial, the fact of Radke's pending application to the federal witness protection program, and by the state's making Radke unavailable or concealing Radke from the petitioner during the trial.

Between February 4 and February 8, 1988, the petition was tried before the habeas court, *Barry, J.* On July 26, 1988, the habeas court dismissed the amended petition. On August 30, 1988, the habeas court granted the petition for certification to appeal, limited to the deliberate concealment claim. On November 7, 1988, the petitioner filed the instant appeal in the Appellate Court. We thereafter transferred the matter to ourselves pursuant to Practice Book § 4023.

At the criminal trial, the case against the petitioner was largely circumstantial and was primarily, albeit not exclusively, dependent upon the testimony of the surviving victim, Thomas Radke. At that trial Radke testified that it was the petitioner who had entered the apartment and fired the shots that killed Reagan and wounded him. He testified that he and Reagan were together in the bedroom of the basement apartment they shared. Reagan was watching television while Radke was in bed, sleeping with a pillow wrapped around his head to drown out the noise of the television. Radke testified that he was awakened by the familiar sound of the petitioner's voice. He testified that

he heard the petitioner say "turn down the t.v." and then "somebody told about the Mancione score." Radke testified that almost immediately thereafter he heard three shots fired from a gun. He then testified that he started to get up but lost consciousness. When he regained consciousness the pillow was stuck to the left side of his head. Radke further testified that he tried to arouse Reagan, who was lying on the floor, but that she did not move. Radke testified that he then dressed and walked to a nearby cafe to summon help. He was thereafter hospitalized and treated for five bullet wounds to his neck and head. A forensic expert determined that the bullets removed from Reagan and Radke were fired from the same gun, a weapon that was never located.

On June 24, 1980, two days prior to Radke's testimony at trial, assistant state's attorney Walter Scanlon sent a letter to Harold Pickerstein, chief assistant United States attorney, seeking to place Radke in the federal witness protection program. On June 25, 1980, Pickerstein sent a letter to Scanlon acknowledging receipt of Scanlon's June 24 letter. During Radke's testimony on June 26 and 27 he maintained that there had been no promises, threats or deals made with or to him by the state in exchange for his testimony against the petitioner. Radke did acknowledge that he hoped that some consideration would be given for his testimony, i.e., that he would receive little or no punishment for the larceny and forgery charges to which he had recently pled guilty.

Radke was cross-examined for the better part of two days and concluded his testimony on June 27, 1980. At that time the petitioner's trial counsel, Michael C. Hagstrom, did not indicate to the trial court that Radke would be required to testify again, nor did he request the trial court to order Radke back at any specific time. On June 27, 1980, Radke had not yet been approved

to enter the federal witness protection program and neither Radke nor the state mentioned the pending efforts to place him in the program.

After the conclusion of Radke's trial testimony, Hagstrom learned that Radke had been the primary informant with respect to a search warrant issued in New Haven against Peter Pepe. Hagstrom contacted the attorneys for Pepe who confirmed that Radke was scheduled to testify against Pepe in his upcoming trial on larceny charges. Hagstrom then decided that it was necessary to bring Radke back into court to testify during the presentation of the petitioner's case. Hagstrom believed that the Pepe information revealed that Pepe had as much if not more of a motive to harm Radke as did the petitioner, and that the defense was unable to explore the matter at the time of trial because the information was not available when Radke was on the witness stand. A subpoena was issued that the sheriff unsuccessfully attempted to serve on Radke over the weekend of June 28–29. On July 2, 1980, the sheriff returned the unserved subpoena to Hagstrom with an attached note indicating his inability to find Radke.

On the previous day, July 1, 1980, Hagstrom happened to be outside the state's attorney's office when he observed Radke inside with several other persons. Radke was there to meet with the United States marshal's service, the administrator of the federal witness protection program. On July 3, 1980, after learning of the sheriff's inability to find Radke and serve him with the subpoena, Hagstrom sought an order requiring the state to disclose Radke's whereabouts. Hagstrom stated his belief that Radke either was being held in protective custody or had left the jurisdiction in order to avoid further testimony. In response, Scanlon represented to the trial court that Radke was not in protective custody and that he did not know Radke's whereabouts. The court granted the motion "for what

it's worth." Scanlon then stated that in the event he learned where Radke was, he would produce Radke in lieu of disclosing his whereabouts. After further colloquy the court paraphrased Scanlon's statement to Hagstrom as follows: "What he is saying is, as I understand it, you want Thomas Radke, you want the State's help in trying to locate him, if they can find him, they will get him here, that is what he is saying." Hagstrom affirmatively accepted Scanlon's representation, indicating that the state's production of Radke in court was acceptable.

On July 9, 1980, trial testimony was concluded. Hagstrom made no request for a continuance for the purpose of looking further for Radke, or to have the state describe what efforts had been made to locate him. No further reference of any kind was made during the trial concerning Radke's testifying for the defense. On July 11, 1980, the verdict was reached.

On August 15, 1980, at the sentencing hearing, the petitioner filed a motion to dismiss. Hagstrom claimed that on August 11, 1980, after acceptance of the verdict, he discovered that Radke had entered the federal witness protection program. He contended that the state both knew of Radke's whereabouts when it denied such knowledge on July 3, 1980, and in fact had assisted Radke's entrance into the witness protection program. Hagstrom claimed that after the conclusion of his cross-examination of Radke, he uncovered the new information regarding the statement Radke had given to the New Haven police concerning the forgery and larceny charges previously pending against Radke that implicated Pepe. Hagstrom argued that the state had "sequestered" Radke and as a result the petitioner had lost his right to confront Radke and contradict his earlier testimony.

The state denied hiding Radke or misrepresenting his whereabouts. The state contended that it notified the United States attorney's office before trial of Radke's desire to enter the witness protection program, and that the state was then told that Radke would be interviewed by the appropriate federal agency. The state was told that from that point on it would be excluded from the matter. Radke did not obtain approval to enter into the program until July 11, 1980, and the state did not learn of this until a later date. Radke remained in the program until July 24, 1980. The trial court denied the petitioner's motion, stating that the court did not know when Radke had entered the program or when the state had become aware of it. The trial court also noted that Radke had undergone extensive and vigorous cross-examination and that there had been no request for a continuance.

On direct appeal to this court, the petitioner raised several issues, including a claim that the state's alleged concealment of Radke's whereabouts violated the petitioner's rights under the compulsory process and due process clauses of the federal and state constitutions. We rejected the petitioner's compulsory process claim, noting that Radke testified as a witness for the state, that he was subjected to grueling cross-examination, that at the end of his testimony he was excused and neither party indicated that he would be called again as a witness, and that Radke would have had no reason at that time to think he might be called as a witness again. *State* v. *Lubesky,* 195 Conn. 475, 479–80, 488 A.2d 1239 (1985). Due to these circumstances, and the fact that the petitioner at no time either requested a continuance or moved for a mistrial, we rejected the claim that the petitioner's right to compulsory process was violated. Id., 480.

We declined, however, to review then the claim that the petitioner raises in the instant proceeding, i.e., that

a due process violation occurred because the state deliberately concealed Radke when the petitioner sought to recall him as a defense witness. Id. While agreeing that the deliberate concealment of an eyewitness in order to prevent his testifying at trial constitutes a prima facie violation of due process, we noted that "[t]he parties are clearly at odds over whether the state deliberately concealed the whereabouts of Radke from the [petitioner]. Absent an evidentiary hearing on this issue, the claim is extremely difficult to review. The [petitioner] has failed to show on this record that the state knew anything more than he did as to Radke's whereabouts. We therefore find no error." Id., 480. We went on to note that "[t]his holding, however, does not preclude the [petitioner] from pursuing his claim in an appropriate collateral action in which he will have an opportunity to develop a complete factual record at an evidentiary hearing." Id., 480 n.1.

On May 20, 1985, the petitioner commenced this habeas action to challenge the due process implications arising from the state's alleged concealment of Radke's whereabouts. At the habeas hearing Radke testified that when he left the trial courtroom on June 27, 1980, he was "on his own." He further testified that between Friday evening, June 27, 1980, and Sunday night, June 29, 1980, he stayed at a Danbury motel and that the lodgings were arranged and paid for by the state. Scanlon and inspector Thomas Bouley both testified that they felt sympathy for Radke and agreed to put him up in the motel over the weekend and that Radke chose Danbury because he wanted to be near Reagan's parents.

During the habeas hearing Radke further testified that on Sunday, June 29, 1980, he slipped and fell in the shower of the motel and was taken to the Danbury hospital emergency room He was released on Monday, June 30, 1980, and went from there to the Reagan

home. On that day Bouley and inspector Donald Rice, also a member of the state's attorney's office, went to visit Radke at the Reagan home after learning that Radke had been injured and had left the motel. Bouley testified that they wanted to investigate whether Radke's injury was accidental or whether someone had hurt him. Rice testified that Radke said "he was perfectly capable of taking care of himself and he was all set; that he needed no assistance from us." Bouley testified that Radke also stated that he planned to stay with the Reagans. The petitioner failed to elicit any specific testimony from Bouley indicating whether the inspector knew that Radke planned to stay with the Reagans for the entire week, and if so, whether he reported this fact to Scanlon.

On July 1, 1980, Radke went to Scanlon's Waterbury office for an interview with Dennis Barry of the United States marshal's service. Radke testified at the habeas hearing that he had stayed at the Reagan home for about one week, from June 30 until July 8 or 9, 1980. At that time Radke left the Reagan home and with his new girlfriend returned to Waterbury to stay with her parents. During this period the United States marshals knew where to contact Radke, although Radke testified that he did not know how to reach them. Radke testified that on July 10, 1980, he was notified of his formal acceptance into the witness protection program and that on July 11, 1980, a marshal picked up Radke at the Waterbury home of his girlfriend's parents. Radke was taken to an airport where he was flown to an unspecified location.[5]

At the habeas hearing Radke further testified that between June 27 and July 11, 1980, he came and went as he pleased, was essentially on his own, had no con-

[5] On July 16, 1980, Radke signed a memorandum of understanding with the marshal's service. This memorandum listed Walter Scanlon as the sponsoring agent and Donald Rice as the case agent.

tact with anyone in the Waterbury state's attorney's office, and was not told by anyone in that office to make himself scarce or hide himself. He testified that if he had been contacted after June 26 and 27, 1980, to come back to the trial court, he would readily have done so. Radke also testified that during this period his bondsman knew where he was. Scanlon, Rice and Bouley all testified that they did not know where Radke was between July 3 and July 11, 1980, and that they did not conceal his whereabouts. Scanlon testified that when he represented to the court on July 3, 1980, that he would produce Radke if he learned of his whereabouts, he had not seen Radke since June 27, 1980, and that he did not conceal Radke's location. He testified that he knew Radke had been lodged in a motel on June 28 and 29, 1980, at state expense, but that this was done because Radke was without funds. Scanlon testified that he was not present at the July 1, 1980 interview between Radke and the federal marshals held in Scanlon's Waterbury office, although the federal government record of the interview indicates he was present. He further testified that he was aware that the state would need to pay the costs of Radke's initial entrance into the witness protection program, but that those expenses would be small. Scanlon testified that he did not know whose idea it was to place Radke in the witness protection program, but admitted that he made the initial contact with the United States attorney's office in order to gain Radke's admission into the program.[6] He testified that Radke was placed in the federal witness protection program because there was a fear for his life.

Michael Hagstrom, the petitioner's trial counsel, also testified at the habeas hearing. He testified that while

---

[6] On July 11, 1980, at Scanlon's behest, the bonds in two of Radke's pending cases were lowered or changed to promises to appear as a prerequisite for his entering the witness protection program.

he was "looking like crazy" for Radke, he did not contact either Radke's bondsman or attorney. Hagstrom also testified that he did not ask to recall Radke when Radke concluded his direct and cross-examination testimony and left the stand, or to have Radke made available at some time in the future.

At the conclusion of the hearing the habeas court found that the petitioner had not sustained his burden of proving that the state had deliberately concealed Radke in order to prevent him from returning to the witness stand. Although it concluded that the state had knowledge of Radke's whereabouts through June 30, 1980, and that Scanlon might have seen Radke on July 1, 1980, the habeas court found that neither Scanlon nor any member of the state's attorney's office knew where Radke was between July 1 and July 11, 1980, concluding that "[t]he record is devoid, however, of any evidence that Mr. Scanlon or any member of his office knew of the whereabouts of Radke between July 1, 1980 and his entry into the witness protection program on July 11, 1980." The habeas court noted that Radke's testimony to the effect that no one suggested he hide or absent himself from the area was consistent with the testimony of Scanlon, Bouley and Rice.

The deliberate concealment of an eyewitness in order to prevent his testifying at trial constitutes a prima facie deprivation of due process. *Hernandez* v. *Estelle,* 674 F.2d 313, 315 (5th Cir. 1981); *Ashley* v. *Wainwright,* 639 F.2d 258, 261 (5th Cir. 1981); *Lockett* v. *Blackburn,* 571 F.2d 309, 311 (5th Cir.), cert. denied, 439 U.S. 873, 99 S. Ct. 207, 58 L. Ed. 2d 186 (1978); *State* v. *Lubesky,* supra, 480. A showing of deliberate concealment ripens into constitutional error if the witness' testimony would have been material, i.e., upon a showing that the missing witness' testimony, when evaluated in the context of the entire record, would create a reasonable doubt of guilt that would not other-

wise exist.[7] *Lockett* v. *Blackburn,* supra, 314. Courts have found deliberate concealment where the state affirmatively encourages and assists the witness' disappearance from the jurisdiction despite the knowledge that the witness is under a subpoena or is otherwise a necessary defense witness. *Hernandez* v. *Estelle,* supra, 315–17; *Clark* v. *Blackburn,* 632 F.2d 531, 534 (5th Cir. 1980); *Freeman* v. *Georgia,* 599 F.2d 65, 68–71 (5th Cir. 1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 641 (1980); *Lockett* v. *Blackburn,* supra, 311, 313–14.[8]

The state has no obligation, however, to locate defense witnesses or to secure their presence at trial in the absence of a showing that the witness is under the state's custody or control; *Guaraldi* v. *Cunningham,* 819 F.2d 15, 19 (1st Cir. 1987); *Jacobson* v. *Henderson,* 765 F.2d 12, 16 (2d Cir. 1985); or that the witness' unavailability was caused by the state's suggestion or procurement; *United States* v. *Ballesteros-Acuna,* 527 F.2d 928, 930 (9th Cir. 1975); or by the state's unilateral, overt action. *United States* v. *Gonzales,* 617 F.2d 1358, 1363 (9th Cir.), cert. denied sub nom. *Patel* v. *United States,* 449 U.S. 899, 101 S. Ct. 268, 66 L. Ed. 2d 129 (1980); *United States* v. *Hernandez-Gonzalez,* 608 F.2d 1240, 1244 (9th Cir. 1979). Courts will reject claims of deliberate concealment where the witness leaves the jurisdiction on his own volition or initiative or where, for other reasons, the defendant's inability to locate the witness is not attributable to the state. *United States* v. *Layton,* 855 F.2d 1388, 1408 (9th Cir. 1988), cert. denied, 489 U.S.

---

[7] Because we find that the habeas court record, considered as a whole, provides no evidence to support a showing of deliberate concealment by the state, we need not address the materiality question.

[8] Cf. *Ashley* v. *Wainwright,* 639 F.2d 258 (5th Cir. 1981) (no deliberate concealment where government bought informant plane ticket to California because defendant had not yet requested informant's presence at trial).

1046, 109 S. Ct. 1178, 103 L. Ed. 2d 244 (1989); *United States* v. *Guzman,* 852 F.2d 1117, 1122 (9th Cir. 1988).

The petitioner, as the plaintiff in a habeas corpus proceeding, bears a heavy burden of proof. *Myers* v. *Manson,* 192 Conn. 383, 387, 472 A.2d 759 (1984). The habeas court's findings regarding deliberate concealment are reviewed as questions of fact and are subject to reversal only if they are clearly erroneous. *Hernandez* v. *Estelle,* supra, 315; *Myers* v. *Manson,* supra, 391. The record of the habeas proceeding does not warrant a conclusion that the habeas court's finding that the state did not deliberately conceal Radke was clearly erroneous. Radke voluntarily went to Danbury upon the conclusion of his trial testimony. At that time there was no suggestion or indication that the petitioner would seek to recall Radke as a defense witness. The petitioner did not seek to recall Radke as a defense witness until July 3. Thus, Scanlon's actions in facilitating Radke's entrance into the federal witness protection program, which began with a letter to the United States attorney's office on June 24, cannot reasonably be said to have been motivated by any desire to prevent Radke from testifying for the petitioner. Moreover, Scanlon had no input or influence on the decision of the federal government to enter Radke into the witness protection program. The mere fact, standing alone, that Scanlon initiated the application on Radke's behalf, is insufficient to constitute a deliberate attempt at concealment.

Although the habeas court record shows that Bouley and Rice were in contact with Radke between June 27 and June 30, they, like Scanlon, had no reason to believe that he would be wanted by the defense for further testimony. While their actions might have contributed to Radke's absence from Waterbury in the days following his testimony, in light of the record before us they cannot reasonably be said to have

deliberately concealed Radke to prevent his testifying for the defense. See, e.g., *Ashley* v. *Wainwright,* supra, 261.

The record adequately supports the habeas court's finding that neither Scanlon, Bouley nor Rice knew Radke's whereabouts between July 3, when Hagstrom moved to disclose his whereabouts, and July 11, when the verdict was reached. The record further supports the finding that as of July 3 neither Scanlon nor the two inspectors were in contact with Radke and that Radke was not in the state's custody or control, but rather was "his own man" who came and went at his pleasure. As factfinder, the habeas court was entitled to credit Scanlon's testimony that on July 1 he was present only momentarily when the federal authorities arrived to interview Radke and that he left soon thereafter without seeing or speaking with Radke. See, e.g., *State* v. *DeForge,* 194 Conn. 392, 398, 480 A.2d 547 (1984). The habeas court was also entitled to credit Scanlon's testimony that on July 3, when the petitioner made his motion for disclosure, Scanlon knew only that Radke was not in protective custody. In light of the record, as a whole, the habeas court's finding that the state did not know Radke's whereabouts during the period in question and did not deliberately conceal him from the petitioner is not clearly erroneous.[9]

[9] In his appellate brief, the petitioner argues for the first time that the state failed to fulfill a promise, made by Scanlon to the trial court on July 3, that it would look for Radke and, if possible, produce him in court. The petitioner apparently contends that the breach of this promise amounted to a due process violation.

This is the first time, however, that this claim has been raised in the instant proceeding. The amended petition contains no reference to the July 3 "promise" by Scanlon, either as related to the deliberate concealment claim or as an independent ground for relief. No testimony concerning the efforts made by Scanlon to locate Radke was elicited at the habeas proceeding. The habeas court did not rule upon or even refer to a claim relating to a

There is no error.

In this opinion the other justices concurred.

promise made by Scanlon to the trial court. Moreover, the habeas court did not certify such an issue for review. See General Statutes § 52-470 (b).

Whether the state violates the due process provisions of the state and/or federal constitutions when it makes a representation in open court, on the record, that it will produce a witness in lieu of disclosing his whereabouts, is a separate question. The record of the habeas proceeding is wholly inadequate to constitute the proper factual record necessary for this court to consider that question. A crucial question would be whether it was reasonable for the defense to rely upon the representation as formulated to the court. Also, such a representation may affect the state's duty vis-a-vis the law of deliberate concealment, as well as its general duty to the court. See, e.g., *State* v. *Williams,* 203 Conn. 159, 169, 523 A.2d 1284 (1987).