[No. A031208. First Dist., Div. Three. May 20, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO VALENCIA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Parts IV and V of the majority opinion are not certified for publication. (Cal. Rules of Court, rules 976(b) and 976.1.)

COUNSEL

Paula K. Canny, under appointment by the Court of Appeal, and Dek Ketchum for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Stan M. Helfman and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

MERRILL, J.—Appellant Antonio Valencia was convicted by a jury of one count of possessing heroin for sale (Health & Saf. Code, § 11351) and one count of selling or offering to sell heroin (Health & Saf. Code, § 11352). Additionally, appellant was found to have sold or offered to sell 14.25 or more grams of heroin in violation of Penal Code section 1203.07, subdivision (a)(2) and to have possessed for sale 14.25 grams or more of heroin within the meaning of Penal Code section 1203.07, subdivision (a)(1), making him ineligible for probation. Appellant appeals from the judgment of conviction.

I

In May 1984, Detective Michael Preston of the San Mateo Sheriff's office met with a police informant (hereafter informant) at his office to discuss and plan a controlled buy of heroin from an alleged local drug dealer by the name of Ceja. Informant had obtained a lead on Ceja and his drug-related activities and passed that information along to Preston.

According to informant, Ceja had approached him at his car repair business in Redwood City and offered to sell him cocaine and heroin. Ceja told him that he had a friend who purchased these drugs in Mexico. Informant said he later visited Ceja at his apartment in Redwood City and told him that he had clients who wished to purchase these drugs. Ceja told informant at that time that his "new connection" could get him as much heroin as he

wanted. Informant told Preston that Ceja offered to sell him two or two and one-half ounces of heroin.

Preston and informant discussed the plans for the controlled buy. Then putting the plans into action, Preston first searched informant, taking all property on his person and placing it in a bag. Preston next gave informant $18,000 with which to purchase the heroin. The money was in denominations of fifties assembled into bundles of $1,000 each. The $18,000 had been taken from a special fund in the sheriff's office earmarked for such use. The money· was placed in a Folger's coffee can, making it readily visible. All of the bills and their serial numbers had been photocopied. Preston told informant to hold on to the money until he obtained the Mexican heroin (called chiva). Informant was also told not to let the money leave his truck.

Detective Preston then affixed a small hidden radio transmitter to informant, which had a maximum range of transmission of one-quarter mile. Next, the two men went outside to where informant's pickup truck was parked. Detective Preston searched the truck. Afterward, informant drove the pickup truck to Ceja's address, followed by Preston and six other undercover police surveillance units. Preston was accompanied by Officer Schumaker who could speak and translate Spanish.

Informant parked in front of Ceja's apartment building and made contact with Ceja through an outside intercom. He told the suspect that he had the money and asked if Ceja had the merchandise. Ceja indicated that he did have the merchandise. Ceja then joined informant in the truck and instructed him to drive to an East Palo Alto address. Police followed.

Informant drove to an apartment complex. As Ceja got out of the truck, informant showed him the coffee can full of money. Ceja went into the apartment building, returning to the truck about five minutes later. Upon his return, Ceja told informant that his connection had only two ounces of heroin to sell him at that time but would have an additional half ounce later that afternoon. He also indicated that the connection did not want to make the deal inside the vehicle. Informant told Ceja to tell the third party that he would go ahead and purchase the two ounces now but that he preferred to transact the business in his vehicle. Ceja went back inside the apartment building. Moments later Ceja returned to the truck accompanied by the third party, appellant. Appellant told informant that he would not make a deal in the street because "if the narcos go by they will take you to jail and they will take us to jail." At this point, informant agreed to join Ceja and appellant in apartment No. 19. Informant advised Detective Preston over the hidden transmitter of the change in plans.

Informant then got out of his truck and headed for the designated apartment. He found the door to the apartment ajar about a foot and entered. Inside, Ceja, appellant, and a man named Barron were waiting for him in the living room. The three escorted informant to a bedroom in the apartment. Appellant sat on the bed. Informant, holding the coffee can of money, also sat on the bed. Barron stood with his back to the door and Ceja stood on the other side of the room.

Informant began counting the money and appellant recounted it. Midway through this, informant asked to see the heroin. Appellant instructed Barron to show it to him. Barron produced some dark brown chiva wrapped in a paper towel. Barron put the heroin on the lid of the coffee can and put the lid on top of a small television set in the bedroom.

While all of this was taking place, Detective Preston could hear the men counting the money by means of the hidden transmitter. According to Preston's later testimony, informant signaled the officers pursuant to a prearranged plan to close in. Preston testified: "[H]e had gotten very deliberate about counting the dinero. . . . [H]e was signaling us to come in, and save him, come on in and arrest him as we had previously described."

Members of the undercover unit arrived at apartment No. 19 simultaneously. The door to the apartment was still ajar. Officer Schumaker spoke with a woman who greeted the officers at the door. Schumaker explained to the woman that the officers were going to have to enter the apartment and seize the money and the chiva. The officers entered the living room and proceeded down a short hallway to a bedroom. Inside, they found informant, Ceja, Barron and appellant. Appellant was counting the money which was spread out on the bed. The Folger's coffee can was sitting in the center of the bed. On top of a television set at the side of the bed officers saw some tissue and two "chunks" of a substance which appeared to be heroin.[1] Preston photographed the money and the heroin and then sealed the heroin in plastic baggies. The amount of money seized corresponded with that which had been given to informant for the transaction.

Police then arrested appellant, Ceja and Barron. Informant was also taken into custody to prevent disclosure of his connection with the police. Appellant told the officers that he lived in apartment No. 68 in the same complex.

Subsequently, Detective Preston obtained a search warrant for appellant's apartment. This warrant was executed about 8:30 p.m. the same day. Inside

---

[1]The two "quantities" of substance found in the apartment were later identified as 23.85 and 23.96 grams of heroin.

apartment No. 68, police found a triple beam scale, 12 carbon steel blades, and a metal handle for the blades. Preston observed that there were 30 to 40 scars on the top of the scale. Preston later testified that these marks were consistent with the knives that were found. According to Preston, heroin from Mexico is a tarry solid which has to be cut. Preston was of the opinion that the subject items were possessed for the purpose of the sale and distribution of heroin and that the heroin found in apartment No. 19 was possessed for purpose of sale.

In addition to the above facts, the following evidence was adduced: A police tape of the drug transaction was introduced into evidence and played to the jury. In addition to this, the jury had before it a transcript of the tape. Informant made an in-court identification of the voice on the tape which states, " '[N]ot here because narcos go by very frequently,' " as belonging to appellant. Subsequently, appellant was ordered by the court, upon the prosecution's request, to speak some lines from the tape.

Detective Rancio Young, a member of the surveillance team which followed informant to the scene of the crime, identified appellant as one of the two men he saw standing in the driveway adjacent to where informant was parked. He said he also saw informant later enter apartment No. 19. Shortly thereafter, Young, himself, entered the apartment along with other officers. Young made an in-court identification of appellant as the person he saw both outside and inside the apartment.

## II

 Appellant's first contention on appeal is that the trial court erred in denying his motion to suppress evidence pursuant to Penal Code section 1538.5. Appellant maintains that police violated the constitutional proscription against unreasonable searches and seizures by entering apartment No. 19 without either an arrest or a search warrant and that any evidence seized as a result of that entry must be suppressed.[2] The motion was submitted by the parties on a basis of the preliminary hearing transcript, moving and responding papers, and argument of counsel. Having reviewed the pertinent record, we find no merit in appellant's position.

 "A warrantless arrest in the home is per se unreasonable absent exigent circumstances." (*People* v. *Mendoza* (1986) 176 Cal.App.3d 1127, 1130 [224 Cal.Rptr. 145], citing *Payton* v. *New York* (1980) 445 U.S. 573, 590 [63 L.Ed.2d 639, 653, 100 S.Ct. 1371], and *People* v. *Ramey* (1976) 16

---

[2]Appellant's standing to raise this issue was apparently conceded by the prosecution at the section 1538.5 hearing.

Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) "[W]hen officers have *valid probable cause* to believe a certain suspect has committed an offense 'exigent circumstances' may excuse them from obtaining a warrant before entering the premises to arrest that person." (*People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1052 [192 Cal.Rptr. 897].) " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey, supra,* 16 Cal.3d at p. 276.)

Here, it is beyond question that at the time of the subject entry, police had valid probable cause to believe that appellant and his codefendants were in the process of committing an offense. Based on the information they received from informant, coupled with what they themselves saw and heard, they could reasonably conclude that a sale of heroin was taking place in apartment No. 19.

The real issue then, as recognized by both sides, is whether or not there were exigent circumstances justifying the warrantless entry. As noted by our Supreme Court in *People* v. *Ramey, supra,* 16 Cal.3d 263, a determination of this issue must be made in light of the facts known to the officers at the time.

In examining such facts in the instant case, one arrives at the following disposition: At the time of the entry, Detective Preston had reason to believe that Ceja was a primary drug dealer in the area, dealing in large quantities of both heroin and cocaine. He also knew that Ceja had at least one "connection" providing him with these drugs. Preston and his accompanying officers knew they were witnessing a drug deal in progress, one which they had set up with the aid of an informant and which involved large amounts of heroin and money. Unexpectedly, however, the transaction had been transferred from a location which was well within their view (i.e., the informant's vehicle) to a location which was not (i.e., a second-story apartment within a large apartment complex). This triggered concern on the part of Preston who, with the aid of the hidden radio transmitter, heard the voices of "at least five people" inside the apartment and heard the money being counted out. Informant who was situated inside the apartment with the suspects, was in a dangerous position. Preston was fearful that police might lose track of the money. He testified that it was his experience that in a sale this size with so many participants, each person got his cut of the money and then quickly dispersed. Losing track of the money and the participants was especially likely in such a large apartment complex.

We think it manifest that on this set of facts and considering the totality of circumstances (see *United States* v. *Hicks* (9th Cir. 1985) 752 F.2d 379), there were exigent circumstances justifying the warrantless entry of apartment No. 19. Considering the unexpected change in settings for the drug transaction and the number of people involved, it was reasonable for the police to be concerned about possible loss of the money as well as other evidence. Police knew that not all of the suspects lived in apartment No. 19, so the possibility of escape was heightened. They were also aware that the money was critical evidence inasmuch as a record of the serial numbers had been kept. As stated in a legal treatise on the Fourth Amendment by Wayne R. LaFave: "[W]hen the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it. One factor . . . which is often of significance in this context concerns the preservation of evidence. The basic point is that while the making of an arrest is often thought of as serving the purpose of gaining custody of the criminal, arrest at a particular time will often serve the equally (or perhaps more) important function of terminating a criminal enterprise before the evidence thereof is destroyed or disseminated. Thus, totally apart from the question of whether a need to save evidence should justify a warrantless entry and full search for that evidence, it makes great sense to recognize that frequently an immediate entry to arrest is necessitated so that the defendant can be disabled from destroying or distributing evidence. Once the police are inside, they may uncover that evidence in a search incident to arrest or may find it in plain view, or at a minimum will have custody over the defendant during that critical period while a search warrant is obtained and executed.

". . . . . . . . . . . . . . . . . .

"There is yet another reason . . . why officers in the field must often take immediate action even though the person to be arrested could probably be found later and arrested pursuant to a warrant obtained in the meantime. Not infrequently, a prompt entry to arrest is called for in order to minimize the risk that someone will be injured or killed. Sometimes the risk is to another person who is also in the premises to be entered, such as an undercover agent or informant, a possible hostage, or an individual the person to be arrested knows has cooperated with the police." (2 LaFave, Search and Seizure (1987) § 6.1(f), pp. 601-605.)

The dissenting opinion in this case is incorrect when it states that our majority opinion relies mainly upon testimony adduced at trial. Both Detective Preston and informant testified in detail at the preliminary hearing as to the events which took place inside and outside the apartment. Also, we disagree with the conclusion in the dissent that the informant never testified at the preliminary hearing that he was in fear of his safety at any time during the transaction. In fact, when asked by the district attorney why he did not want to go inside the apartment, he stated: "[B]ecause I got a lot of money with me. I don't want to get in trouble with me in the apartment." We believe the clear import of this testimony is that the informant was concerned for his safety.

Additionally, the dissent questions the propriety of considering the amount of money when determining whether any exigent circumstances exist. However, it does not address the fact that the money was also important physical evidence.

We find further support for our decision based on the good faith demonstrated by the officers. (See *United States* v. *Hicks, supra,* 752 F.2d at p. 383.) This is evidenced by the fact that the officers had intended for the drug transaction to take place inside the informant's vehicle and not the apartment, a point which undercuts appellant's claim that police manufactured their own exigent circumstances. It is also evidenced by the fact that once inside apartment No. 19, they limited their search to those things which were in plain view.

Appellant's reliance on *People* v. *Ellers* (1980) 108 Cal.App.3d 943 [166 Cal.Rptr. 888], is misplaced. In *Ellers,* police, with the aid of an informant, set up a controlled buy of heroin from a suspected drug dealer. Police searched the informant, then took him in an unmarked police car to the dealer's residence. Police gave the informant a total of $30 with which to buy the heroin. The informant got out of the car and approached the front door of the dealer's apartment. The dealer invited him in. Once inside, the informant saw other people purchasing heroin from the dealer as well. The informant gave the suspect the money and received a red balloon and a $5 bill in exchange. The informant returned to the police car, handing over the balloon and the money.

Afterward, the police in the unmarked car met with other police units in the area at a nearby parking lot. The officers talked approximately 10 to 15 minutes about plans to arrest the dealer. They then returned to the dealer's residence without the informant, knocked on the door, identified themselves, and demanded entry. Hearing no response, they entered the premises and

arrested the dealer whom they found inside. The dealer was charged with both selling heroin and being under the influence.

The Court of Appeal reversed the conviction for being under the influence of heroin, and affirmed the sale of heroin conviction. The court held that there were no exigent circumstances justifying defendant's arrest in his home without a warrant and that, accordingly, evidence of defendant's being under the influence obtained following his arrest had to be suppressed. The court said the informant had no personal knowledge concerning the quantity of heroin in the possession of the dealer that evening and, as a result, the officers had no reason to believe that the heroin would be sold out during the time a warrant was sought. The court said that an awareness of heavy traffic without more did not establish the necessity of the immediate action which was taken. The court found added support in its decision in the fact that the police officers first met at a parking lot to discuss the matter. Said the court, "This further supports the ... finding there was adequate time to obtain a warrant." (*People* v. *Ellers, supra,* 108 Cal.App.3d 943, 950.)

The case at bar is readily distinguishable from *Ellers.* Here, police knew the total amount of heroin which was involved in the transaction and, by virtue of what they heard by means of the hidden radio transmitter, they knew that the deal was about to be finalized and that the suspects were about to disperse with critical evidence. They also knew that informant was in a vulnerable position. As a result, unlike the situation in *Ellers,* time was of the essence in the instant case and the immediate action on the part of the police reasonable and warranted.

### III

On July 26, 1984, Barron pled guilty to one count of possessing heroin for sale (Health & Saf. Code, § 11351) and Ceja pled nolo contendere to one count of selling or offering to sell heroin (Health & Saf. Code, § 11352) and was found guilty of this offense by the court. Each of these defendants was sentenced to one year in county jail with 161 days of good time/work time credits. On January 10, 1985, their sentences were completed and they were released to the Immigration and Naturalization Service for deportation to Mexico.

On January 28, 1985, appellant's own trial commenced. At this time appellant moved for a dismissal on the grounds that Barron and Ceja were no longer available as material witnesses as a result of state action, which in turn allegedly deprived him of the opportunity of a fair trial. Appellant claims reversible error based on the trial court's denial of the motion. We find no error.

"A defendant in a criminal action is not entitled to a dismissal merely because he is unable to produce witnesses assertedly necessary to his defense [citation]. If, however, state action has made a material witness unavailable, dismissal is mandated by due process and a defendant's constitutional right to a fair trial. The principles involved were . . . summarized by the Supreme Court in *Bellizzi* v. *Superior Court* [1974] 12 Cal.3d 33, beginning at page 36 [115 Cal.Rptr. 52, 524 P.2d 148]: 'The fundamental due process principle . . . is that the prosecution may not deprive an accused of the *opportunity* to present material evidence which might prove his innocence. Even if the prosecution's motives are "praiseworthy," they cannot prevail when they "*inevitably* result, intentionally or unintentionally, in depriving the defendant of a fair trial." [Citation.]' " (*People* v. *Mejia* (1976) 57 Cal.App.3d 574, 579-580 [129 Cal.Rptr. 192].)

In the instant case, it cannot be said that by the deportation of Barron and Ceja the prosecution deprived appellant of the opportunity to present material evidence which might have proven his innocence. First of all, it is apparent that appellant in this instance had plenty of opportunity to make use of the subject witnesses in the preparation of his case prior to their deportation, had he chosen to do so. Ceja and Barron were arrested along with appellant on May 14, 1984. The three were all present at the preliminary hearing on May 30, 1984. They appeared together for arraignment in superior court on June 14, 1984. Appellant was present when the two codefendants pled guilty on July 26, 1984. From the time Ceja and Barron were sentenced on August 28, 1984, to the time they were deported at the completion of their sentence, January 10, 1985, appellant had five months to make contact with these witnesses. He did not. Had he chosen to do so, appellant had plenty of time in which to either depose and/or subpoena these witnesses, thereby staying deportation.

Nor can appellant excuse his inaction by claiming lack of notice. The record indicates that both he and his counsel were present when Barron and Ceja entered their pleas. They were thus aware that sentencing and service of sentence were imminent for the pair. Additionally, as found by the trial court, the sentencing order for the two clearly indicates that they were to be turned over to immigration authorities upon completion of their sentence. Thus, appellant and his counsel had notice of the impending deportation.

Appellant points out that he had a change in counsel on December 10, 1984. This does not alter our conclusion that he had sufficient opportunity to secure the testimony of these witnesses. A month elapsed between the time of appointment of new counsel and the release of Barron and Ceja from jail.

Finally, there is another equally compelling reason why appellant's argument must fail. The record indicates that the evidence at issue here would

not have proven appellant's innocence but the reverse. In an interview of Barron and Ceja by police before sentencing and after entry of their pleas, the two witnesses implicated appellant in the crime. A police report reflecting this interview and the witnesses' statements was apparently provided to the trial court by the prosecution in response to appellant's dismissal motion. While there is no duty on the part of appellant to establish with certainty that the testimony of Barron and Ceja would have been favorable (see *Cordova* v. *Superior Court* (1983) 148 Cal.App.3d 177, 184 [195 Cal.Rptr. 758]), evidence which indicates the contrary cannot be overlooked.

The two cases relied on by appellant, *People* v. *Mejia, supra,* 57 Cal.App.3d 574, and *Cordova* v. *Superior Court, supra,* 148 Cal.App.3d 177, are readily distinguishable. In both cases, deportation of material alien witnesses was triggered when the prosecution dropped all criminal charges against the witnesses. The deportation took place right away, leaving no opportunity for the nonalien defendants in the cases to interview these witnesses. This fact situation is far different from the instant one where criminal charges remained intact and sentences were served allowing appellant ample opportunity to interview the subject witnesses and where appellant had notice of the impending deportation.

### IV,V*

. . . . . . . . . . . . . . . . . . . . .

### VI

Judgment is affirmed.

Barry-Deal, J., concurred.

**WHITE, P. J.**—I respectfully dissent from the majority's holding that exigent circumstances excused the police from obtaining either a search warrant for apartment 19 or an arrest warrant for appellant.

In *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], certiorari denied 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335], the California Supreme Court held that under the California Constitution and the Fourth Amendment of the United States Constitution warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances. The United States Supreme Court reached the same conclusion in *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct.

---

*Parts IV and V of this opinion are not certified for publication. (See fn., *ante,* p. 1483.)

1371], wherein the court held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. When the person to be arrested is in the home of a third person, the police need a search warrant for the third person's home (so as not to violate the rights of the third person) in addition to arrest warrant for the person to be arrested. (*Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642].)[1]

The majority does not dispute the above-stated rules, but argues that the need for any warrant was excused by exigent circumstances. I first note that the majority to support its position relies mainly upon the testimony adduced at trial. The motion to suppress evidence under 1538.5 was made on the bases of the testimony introduced at the preliminary hearing and the argument of counsel. The majority to support its theory that exigent circumstances excused the obtaining of any warrants incorrectly cites evidence introduced at trial. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 847 [120 Cal.Rptr. 83, 533 P.2d 211].)

The only evidence to support any exigent circumstances that was introduced at the preliminary hearing was that the informant was given $18,000 to make the buy and that Officer Preston feared "that we would possibly lose our money." The officer further testified at the preliminary hearing that he knew five persons were involved in the transaction; and that it has been his experience that when this number of people are involved, the money is divided immediately among these individuals. Officer Preston's reason for giving the order to enter the apartment was based on the fact that the amount involved constituted "one-third of our annual buy fund. [¶] Q. Therefore? [¶] A. Therefore, we would have to change to other investigative techniques during a third of the year." The officer never testified that he had any reason to believe the informant was in danger. The informant also testified at the preliminary hearing and never stated that he was in fear of his safety at any time during the transaction. The People did not argue at the motion to suppress that the informant was in any danger. Thus, any statement in the majority's opinion that the safety of the informant constituted exigent circumstances must be ignored.

In opposition to appellant's motion to suppress the People argued:

---

[1] In *United States* v. *Underwood* (1983) 717 F.2d 482, 484, certiorari denied 465 U.S 1036 [79 L.Ed.2d 707, 104 S.Ct. 1309], the court held that the party named in the arrest warrant cannot raise the fact that the police did not have a search warrant for the premises of the third person's home, because this right is personal to the home owner. (But see *United States* v. *Grandstaff* (1987) 807 F.2d 851, 855, fn. 3.) Since the majority assumes that standing was conceded by the prosecution at the section 1538.5 hearing, it is unnecessary to address the issue of standing any further.

"Exigent circumstances excusing the obtaining of arrest warrants were present in this case because of the possible imminent escape of the suspects and the disbursal of an extremely large amount of cash." The police were well aware that the transaction was taking place in apartment 19. Given what the police heard over the transmitter, the police had probable cause to arrest the people in apartment 19. The police simply could have arrested any person who attempted to depart from said apartment. There were sufficient police officers present on the scene to cover both the front and rear of the apartment building. In other words, exigent circumstances were not present simply because the suspects might escape. All the officers had to do was wait outside the apartment and arrest the suspects as they left the apartment. If the officers had merely arrested the suspects as they left apartment 19, the police undoubtedly would have recovered the $18,000.

Nor can exigent circumstances be based upon the amount of money involved. As appellant aptly points out in his brief: "The sum of money is irrelevant. Were the court to uphold the warrantless entry into this residence solely because the sum of money is $18,000.00 great anomalies within the law would result. A person's right to privacy in the sanctity of a residence cannot be conditioned upon a percentage of money, an amount of money or any relationship to funding of a police department." Furthermore, it was the decision of the police to participate in a buy involving such a large amount of money. It therefore could be argued that the police created their own exigent circumstances. (*People* v. *Shuey, supra,* 13 Cal.3d 835, 849.)

Although "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made, . . . no exigency is created simply because there is probable cause to believe that a serious crime has been committed . . . ." (*Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 753 [80 L.Ed.2d 732, 745, 104 S.Ct. 2091].) A mere possibility that evidence will be destroyed in a drug transaction is not enough to excuse the warrant requirement. "Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes." (*United States* v. *Salgado* (1986) 807 F.2d 603, 609, app. pending.)

In conclusion, the only justification given by Officer Preston for the police entering apartment 19 while the drug transaction was taking place, was the fear that a large sum of money was in jeopardy. Clearly, the amount of money involved does not determine what constitutional rights apply to a situation. To hold otherwise, would result in different legal principles being applied based upon the amount of money involved. I have already noted that the gravity of the offense is to be considered when determining whether any exigency exists. But as noted above the United States Supreme Court in

*Welsh* held that the gravity of the offense by itself does not create an exigency which would excuse the warrant requirements. Therefore, I disagree with the majority's conclusion that exigent circumstances excused obtaining any warrants in this case.

A petition for a rehearing was denied June 11, 1987, and appellant's petition for review by the Supreme Court was denied September 17, 1987.